**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

Jason A. Milner, et al.,

       Plaintiffs,

   v.                          Case No. 2:10-cv-904
                                     JUDGE GRAHAM

Robin Biggs, et al.,

       Defendants.

<u>Opinion and Order</u>

    Plaintiffs Jason and Natasha Milner purchased a home in Beaver, Ohio in May 2010. They later discovered water-related damage in the crawl space and mold in the attic, storage room, spare bedroom closet, and bathroom – defects they claim should have been disclosed by the seller, defendant Robin Biggs. The Milners have also brought suit against the seller's real estate agents, their own real estate agents, the title company, and the home inspector for alleged violations of the Ohio Consumer Sales Practices Act, negligence, and fraud, among other claims.

    This matter is before the court on numerous motions for summary judgment filed by the various defendants and by plaintiffs. For the reasons discussed below, the court finds that each defendant is entitled to judgment as a matter of law.

**I.      Background**

    **A.      Facts**

    The Milners began looking for a new home in the spring of 2010 because of a change in Mr. Milner's employment. N. Milner Dep. at 27-28. They engaged Brenda DePugh of Realtec Real Estate, which is operated by Angela Shanks, as their real estate agent after seeing her name on a listing of homes. <u>Id</u>. at 28-29. DePugh showed the Milners about ten homes, including the one they ultimately purchased at 3772 Germany Road in Beaver, Ohio. <u>Id</u>. at 29-30.

    The Milners walked through the Germany Road house twice. They did not spend much time looking around the house. J. Milner Dep. at 100 (estimating that their walk-throughs were roughly five

minutes long). Mr. Milner looked into the crawl space to see if the house was sitting on gravel or concrete slab, but he did not enter the crawl space. Id. at 101. He did not look in the attic because he would have needed a ladder to get up there. Id. The Milners looked into the storage room, spare bedroom closet, and bathroom but did not see any mold. There were boxes in the storage room and closet. The Milners did not look behind or move any of the boxes. Id. at 127; N. Milner Dep. at 126-28. The Milners had full access to the house before closing and could have inspected every room, closet, and structural area had they wanted to do so. N. Milner Dep. at 254-56. No one discouraged them from doing a closer inspection, and DePugh encouraged the Milners to have a home inspection performed. Id.

The Milners and Robin Biggs exchanged several offers and counter-offers before arriving at an agreed purchase price. N. Milner Dep. at 31-32. Biggs hired as her real estate agent Patti Bevins of Larry Depugh Realty (no relation to Brenda DePugh). Biggs and the Milners entered into a purchase contract on April 12, 2010. The contract contained the following clause:

> CAVEAT EMPTOR: Buyer has examined the Property and agrees to purchase it in its "As is" condition, including any latent defects. Buyer acknowledges that Buyer is relying upon buyer's own inspection and evaluation of the Property, whether performed by Buyer or Buyer's independent inspection or contractors, in determining its condition or fitness. Seller warrants that the Ohio Residential Property Disclosure Form has been completed accurately and thoroughly, and agrees to notify Buyer in writing of any additional disclosure items that arise between the date of acceptance and title transfer. Buyer understands that all real property and improvements contain defects and conditions that are not readily apparent and which may affect a property's use or value. Buyer and Seller agree that the Realtors involved in this transaction have not made any representations about the conditions of the Property and in no way assume responsibility for the Property's condition.

Purchase Contract at § 13.

The contract included an Inspection Addendum in which the Milners agreed to pay for the cost of a whole house inspection and Biggs agreed to pay for a termite inspection and an inspection of the septic system. See Purchase Contract, Inspection Addendum. The box on the Inspection Addendum for a mold inspection was left blank. Id. The Milners signed a Mold Addendum on April 12, 2010 in which they: stated that it was their duty to inspect the house for mold; acknowledged that the presence of mold is "common in residential properties" and that mold sometimes is "covered"; accepted "full

responsibility for all hazards that may result from [the] presence of mold in or around the property"; and stated that they "ha[d] not in any way relied upon any representations of seller [or seller's agents] . . . concerning the past or present existence of mold in or around the property." Purchase Contract, Mold Addendum.

The Germany Road house was built in 1977. Biggs Dep. at 6-7. Biggs owned and lived in the house from October 2006 until May 2010. Id. at 14, 34; Residential Property Disclosure Form at 1. In July 2009, she completed the Ohio Residential Property Disclosure Form that was referenced in the Purchase Contract's caveat emptor clause. On that form, Biggs stated that she was not aware of any water leakage, water accumulation, excess moisture, water-related damage, or any water-related defects in the crawl space. Residential Property Disclosure Form at § D. She also stated that she was not aware of any material problems with the foundation or crawl space. Id. at § E.

The Residential Property Disclosure Form was given to the Milners, who initialed it at the time of purchase. The Form contained the following warning: "Purchaser is advised that every home contains mold. Some people are more sensitive to mold than others. If concerned about this issue, purchaser is encouraged to have a mold inspection done by a qualified inspector." Residential Property Disclosure Form at § D. Biggs indicated on the Form that she had never had a mold inspection performed on the house. Id.

Mrs. Milner asked Brenda DePugh if she could recommend a home inspector. Brenda DePugh recommended Frank Roberts because he was "the best" and "certified," but she stated that she could provide a list of other inspectors. N. Milner Dep. at 37, 39. The Milners hired Roberts to perform a whole house inspection before DePugh could provide them with additional names. Id. at 38.

Roberts completed a program in home inspection training through Inspection Training Associates in Virginia. Roberts Dep. at 8-10. The program included home study courses and hands-on training. Roberts received a certificate of completion upon finishing the program. Id. at 9. At the time he inspected the Germany Road house, Roberts was not a member of the American Society of Home Inspectors ("ASHI") because he had not performed the requisite number of paid home inspections, though his training through Inspection Training Associates met other criteria of ASHI membership.

Id. at 18-19 (testifying that he had performed about 80 inspections, but ASHI required 250 inspection to become a member).

On April 22, 2010, Roberts performed a whole house inspection of the Germany Road house. Access to the crawl space was through a small door in a utility room. Roberts Dep. at 31-32 (estimating that the door was two feet wide by two feet high). Roberts lowered himself into the crawl space, which he described as "very low" – "Twenty inches is about all the room you had. . . . Because when you step down from the house into the crawlspace, the floor hits you about just above your knees. So you're sitting there like you're in a hole." Id. He tried "army-crawling" in the crawl space, but "couldn't move around a lot" because piping and fallen ductwork prevented him from getting very far. Id. at 32. He shined a light around and saw that everything looked dry – "I didn't see any moisture. I didn't see any water." Id. at 33. Roberts found the drainage around the house to be adequate and did not observe any wet areas in the yard. Id. at 28. Though Roberts did not purport to provide any type of mold inspection, he would have noted "organic substance" on the report had he seen the presence of any mold or mildew. Id. at 41-42. Roberts looked into the attic, but did not go into the attic because there was lumber blocking the way. Id. at 30-31.

Roberts provided a written home inspection report to the Milners. It stated that the scope of his inspection was a "limited visual inspection of the general systems and components of the home" and did not include any area that was not exposed to view, concealed, or inaccessible. Roberts Inspection Report at 1. The report found eight main items of concern, including a crack in the concrete of the front porch and the fallen ductwork in the crawl space. On the page of the report concerning the foundation of the house, Roberts checked the boxes indicating that he had entered the crawl space and not seen any moisture. Id. at 6. In the comments box he wrote, "Only 20″ of crawl space height; ductwork running down center of home full length; difficult to access entire area; crawl space is dry." Id.

Following the home inspection, Biggs and the Milners entered into an addendum of the purchase contract in which Biggs agreed to fix certain items that Roberts had recommended as needing attention. This included the fallen ductwork. See Purchase Contract, April 27, 2010 Addendum.

The fallen ductwork was part of a heating and air conditioning system that Biggs had installed in 2009. Biggs Dep. at 8-9. The person she hired to install it was recommended by her father. Biggs had no part in the installation other than giving approval to the installer and his workers to remove some bricks from the exterior wall so they had more room to get the unit into the crawl space. Id. at 9. Biggs did not supervise their work, nor did they report any problems to her other than needing to remove the bricks. Id. at 10-11. Biggs testified that she had never entered the crawl space or looked around the crawl space. Id. at 11-12. Biggs further testified that her brother fixed the fallen ductwork, but she had no further discussions with him about it. Id. at 12.

The Milners closed on the house on May 17, 2010 and moved in the next day. N. Milner Dep. at 8. The Milners selected defendant Arrow Title Agency, LLC to prepare a deed. Mrs. Milner had planned to use Best Title Company, which her lender recommended, but decided to use Arrow when Brenda DePugh indicated that using Arrow would make the travel times easier for everyone involved on the day of closing. Id. at 43-45. Only Mr. Milner's name appeared on the general warranty deed, even though the Milners wanted both of their names to appear. Id. at 48.

Once the Milners moved into the house, they noticed a "soft spot" in their floor, which prompted Mr. Milner to enter the crawl space to look for a cause. J. Milner Dep. at 78-79. He found that the floor joists "appeared to be all rotted." Id. at 79. They also noticed a substance they believed to be mold in the attic, storage room, spare bedroom closet, and bathroom. Id. at 70, 104-05; N. Milner Dep. at 120-21. They observed mold behind where the boxes in the storage room and closet had been located when they made their walk-throughs. Id. at 122, 125. They also found mold when removing wallpaper in the bathroom behind the toilet. Id. at 123-24. The Milners describe the substance they found as "black" and "spotty." Id. at 122. They have not had the substance tested, nor have they had any treatment or remediation done. Id. at 122, 124; J. Milner Dep. at 104.

After filing this lawsuit, the Milners had a home inspection performed by Parker Inspection Services in May 2011. The inspection report found suspected mold growth in the attic, storage room, spare bedroom closet, and bedroom. See Parker Inspection Report at 15, 16, 19, and 20. It also found "moisture penetration" in the crawl space, deterioration of the center wood beam in the crawl space,

termite damage in the joists, and suspected mold growth on the subfloor.  Id. at 22-23.  The report stated that the footer of the foundation was above the frost line and that the one of block walls of the foundation was "wicking moisture."  Id. at 22.  The report also noted that the backyard had standing water and drainage problems because the yard sloped down toward the house and the drain to catch water was not functioning properly.  Id. at 4.

## B. Procedural History

The Milners originally filed suit in the Court of Common Pleas for Pike County, Ohio.  The complaint contained a claim under the federal Real Estate Settlement and Procedures Act ("RESPA"), 12 U.S.C. § 2601, *et seq*.  The case was removed to this court by defendants on October 7, 2010 on the basis of federal question jurisdiction.  See 28 U.S.C. § 1331.

The complaint names the following as defendants: (a) the seller, Robin Biggs; (b) the seller's real estate agents, Patti Bevins and Larry Depugh of Larry Depugh Realty; (c) the buyers' agents, Brenda DePugh and Angela Shanks of Realtec Real Estate; (d) the title company, Arrow Title Agency and its agents Jonathan Holfinger and Chris Moore; and (e) the home inspector, Frank Roberts.

The complaint alleges that the Germany Road house had mold, rotting floor joists, standing water, inadequate drainage, and "insufficient depth of the foundation."  The complaint asserts twelve cause of action: (1) request for injunctive relief; (2) violations of the Ohio Consumer Sales Practices Act; (3) negligence; (4) negligent misrepresentation; (5) breach of fiduciary duty; (6) conspiracy; (7) fraudulent concealment; (8) fraudulent inducement; (9) fraud; (10) breach of contract; (11) violations of RESPA; and (12) unjust enrichment.  Some of the claims are asserted against only certain defendants.

None of the defendants filed a motion to dismiss.  Arrow filed a motion for judgment on the pleadings as to five of the six claims asserted against it.  The motion was granted as to counts two, six, and twelve, but denied as to counts three and four.  See June 8, 2011 Opinion and Order.

Subsequently, defendants Brenda DePugh and Shanks moved for partial judgment on the pleadings as to counts two and six.  This motion is currently ripe for decision, as are ten motions for summary judgment that have been filed by plaintiffs and defendants.

After several of the pending motions were filed, plaintiffs moved for leave to file an amended

complaint to add new claims and defendants concerning alleged termite damage. The court denied this motion, which was filed several months after the completion of discovery and at least six months after plaintiffs knew about the existence of termite damage. See Feb. 10, 2012 Order (finding that granting the motion would result in prejudice to the defendants).

## II.      Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Longaberger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also Longaberger, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

that one party must prevail as a matter of law." <u>Anderson</u>, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Eastman Kodak Co. v. Image Technical Servs., Inc.</u>, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." <u>Anderson</u>, 477 U.S. at 252; <u>see</u> <u>Dominguez v. Corr. Med. Servs.</u>, 555 F.3d 543, 549 (6th Cir. 2009).

### III. Claims Against the Seller

The complaint asserts claims against Biggs for negligent misrepresentation, conspiracy, fraudulent concealment, fraudulent inducement, fraud, breach of contract, and unjust enrichment. These claims, including the breach of contract claim, relate to the same underlying assertion – that Biggs should have disclosed to the Milners that the house had mold in various locations and had water-related damage to the floor joists in the crawl space. Biggs has moved for summary judgment, arguing that the claims against her fail because the Milners purchased the house "as is."

In the sale of real estate, the doctrine of *caveat emptor* applies. <u>Layman v. Binns</u>, 35 Ohio St.3d 176, 177, 519 N.E.2d 642, 643-44 (Ohio 1988). It precludes a purchaser of a house from recovering for a structural defect where the defect is "open to observation or discoverable on reasonable inspection," the purchaser had "an unimpeded opportunity to examine the property," and the seller did not engage in fraud. <u>Id</u>. Further, where the purchase contract includes an "as is" clause, the buyer is precluded from recovering for even a latent defect, absent fraudulent concealment or an affirmative fraudulent representation by the seller. <u>See</u> <u>Felker v. Schwenke</u>, 129 Ohio App.3d 427, 430, 717 N.E.2d 1165, 1168 (Ohio Ct. App. 1998) ("Regardless of whether the defects were patent or latent, the "as is" clause in the purchase agreement absolved the seller from liability for fraudulent nondisclosure."); <u>Dennison v. Koba</u>, 86 Ohio App.3d 605, 609, 621 N.E.2d 734, 737 (Ohio Ct. App. 1993).

The elements of fraudulent concealment or representation are: "(1) a representation or concealment of fact, (2) which is material to the transaction, (3) made falsely, with knowledge of its

falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6) injury proximately caused by the reliance." <u>Felker</u>, 129 Ohio App.3d at 431, 717 N.E.2d at 1168 (citing <u>Black v. Cosentino</u>, 117 Ohio App.3d 40, 44, 689 N.E.2d 1001, 1003-1004 (Ohio Ct. App. 1996)).

## A.     Mold Claims

The court finds that Biggs is entitled to summary judgment on the claims relating to the alleged existence of mold.  Biggs did not make any representations about the existence of mold on the Residential Property Disclosure Form.  The Form asked only whether the seller had, in the past, had the house inspected for mold.  Biggs answered "no" and plaintiffs do not contend that her answer was untruthful.

The Milners argue that Biggs concealed the mold problems in the storage room, closet, and bathroom.[1]  They contend that boxes and clothing blocked their view of the alleged mold in the storage room and the closet when they did their walk-throughs of the house.  They further contend that the mold in the bathroom had been covered by wallpaper.

The court, however, finds that plaintiffs have offered no evidence from which a jury could reasonably find that Biggs acted with the requisite knowledge and intent in allegedly concealing the mold from plain view.  Biggs's unrefuted testimony is that she did not see any mold in the storage room and closet when she put the boxes in the storage room and her daughter's clothes in the closet.  Biggs Dep. at 22-23.  She accessed these areas infrequently.  <u>Id</u>.  As for the alleged mold in the bathroom, plaintiffs' counsel did not ask Biggs during her deposition if she had ever seen it or if she was the one who had put up the wallpaper.  Biggs testified that she had "painted everything" when she first moved into the house, but she did not testify of having put up wallpaper in the bathroom.  <u>Id</u>. at 8.

Plaintiffs have not submitted any evidence to challenge the testimony of Biggs.  Plaintiffs admit that they have never had the mold tested, and there is nothing on the record to indicate when the mold

---

[1]  There is no assertion that Biggs concealed, or had knowledge of, the alleged mold in the attic.

would have started growing. Thus, there is no evidence to support a finding that the mold would have had to have been present and visible to Biggs when she initially placed the boxes and clothing in the storage room and closet or when she later accessed those items.

Moreover, it was unreasonable for the Milners to have relied on the presumption that there would be no mold in these allegedly concealed areas. The Residential Property Disclosure Form cautioned them that "every home contains mold" and that they should perform a mold inspection if they were concerned about this issue. Residential Property Disclosure Form at § D. The Milners then executed a Mold Addendum acknowledging that it was their responsibility to conduct a mold inspection and that they "ha[d] not in any way relied upon any representations of seller [or seller's agents] . . . concerning the past or present existence of mold in or around the property." Purchase Contract, Mold Addendum.

Accordingly, Biggs is entitled to summary judgment on the Milners' mold-based claims.

**B.  Water-Related Damage Claims**

Plaintiffs have not been entirely consistent in describing the nature of the alleged water-related damages. In their complaint, plaintiffs alleged the existence of rotting floor joists, standing water, inadequate drainage, and "insufficient depth of the foundation." Mrs. Milner testified that the "major problem is the whole crawlspace. . . . Moisture, joists, beams, depth." N. Milner Dep. at 144. Mrs. Milner conceded that she has never looked into the crawl space and viewed the alleged problems. Id. at 194. Mr. Milner testified only that the floor joists "appeared to be all rotted." J. Milner Dep. at 79. The Milners did not testify to having seen any standing water in the crawl space or the back yard.

The Parker inspection report provides more specificity about the nature of the defects. It found moisture penetration in the crawl space (including standing water on the day of the inspection), deterioration of the center wood beam, placement of the footer above the frost line, moisture on the rear block wall in the crawl space, standing water in the backyard, and malfunction of the drain in the backyard. See Parker Inspection Report at 4, 22-23.[2]

---

[2]  The court notes that plaintiffs have attached photographs to their brief in opposition to the motion for summary judgment. These photos appear to show a rusty staple in a piece of

The one consistent theme in plaintiffs' presentation of the case is that these water-related defects were made manifest in the deteriorating wood beams in the crawl space. Plaintiffs do not contend that Biggs concealed the beams, but they do allege that she fraudulently represented on the Residential Property Disclosure Form that she was not aware of any water-related damage or defects in the crawl space and not aware of any material problems with the foundation or crawl space. See Residential Property Disclosure Form at §§ D, E.

The court finds that there is no evidence from which a jury could find that Biggs was aware of the deteriorated wood beams in the crawl space. Biggs testified that she purchased the Germany Road house "sight-unseen" at a bank auction and that she did not conduct an inspection before buying the house. Biggs Dep. at 14. She further testified that she never entered or looked into the crawl space while she lived in the house except to reach her hand in to turn a water spigot to the outside of the house off and on. Id. at 11-12. Though her father and brother assisted her with home repairs, there is no evidence that either of them saw the deteriorated beams. And the workers Biggs hired in 2009 to install a heating and air conditioning system did not inform her of any defects in the crawl space. Id. at 10.

Plaintiffs have not refuted Biggs's testimony that she was unaware of the alleged defects in the crawl space. Mrs. Milner testified that she believed Biggs and her father had gone under the house "to beam the house up," but Mrs. Milner admitted that she had no personal knowledge or factual basis to support the her belief. N. Milner Dep. at 116-19. Mrs. Milner indeed conceded, "I'm speculating" in asserting that Biggs knew of defects in the crawl space. Id. at 148.

Finally, it should be noted that plaintiffs have not attempted to prove that Biggs had knowledge of any drainage problems in the backyard. Biggs, for example, was not asked whether she had observed standing water or drainage problems in the backyard. The Parker inspection report, which states that

---

plywood, as well as deteriorated wood beams. The seeming inference is that these photos depict conditions in the crawl space of the Milners' house, but plaintiffs have not authenticated the photos either through an affidavit or deposition testimony. Though defendants do not presently challenge the admissibility of the photos, the court advises plaintiffs' counsel that the better practice would have been to authenticate these exhibits.

the drain in the backyard was not functioning correctly, is not evidence in itself of the existence of a drainage problem when Biggs lived in the house because the inspection took place one year after the closing. Roberts did not observe any problems with water drainage in the backyard when he performed his inspection prior to closing. Roberts Dep. at 49; Roberts Inspection Report at 6. As such, there is no evidence from which a jury could find that Biggs knew or should have known that drainage problems posed a material risk to the foundation.

Accordingly, the court grants the motion for summary judgment as to the water-related damage claims against Biggs.

### C. Conspiracy Claim

The complaint alleges that Biggs conspired with her real estate agents Patti Bevins and Larry Depugh to sell a house with structural defects. A civil conspiracy is "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." Williams v. Aetna Fin. Co., 83 Ohio St.3d 464, 475, 700 N.E.2d 859, 868 (Ohio 1998). "The malice involved in the tort is that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another." Id. (citation and quotation marks omitted).

There is no evidence that Biggs acted with malice in selling her house to the Milners. As discussed, plaintiffs have failed to produce evidence from which a jury could find that Biggs had knowledge of the alleged mold or water-related defects. Plaintiffs have also failed to produce evidence from which a jury could find that Biggs had an agreement or understanding with her real estate agents to defraud the Milners. N. Milner Dep. at 250 (admitting, "I have no evidence of it, no," when asked whether the conspiracy allegations had any factual support).

Thus, Biggs's motion for summary judgment is granted as to the conspiracy claim as well.

### IV. Claims Against the Seller's Real Estate Agents

The complaint asserts claims against Patti Bevins and Larry Depugh for injunctive relief, violations of the Ohio Consumer Sales Practices Act ("OCSPA"), negligence, negligent

misrepresentation, conspiracy, fraudulent concealment, and unjust enrichment.

## A.     Injunctive Relief and OCSPA Claim

OCSPA prohibits the use of an unfair or deceptive act in connection with a consumer transaction.  O.R.C. § 1345.02(A).  The complaint alleges that Larry Depugh has violated OCSPA by operating his real estate agency Larry Depugh Realty without registering it with the Ohio Secretary of State.  To that end, the complaint seeks an order permanently enjoining him from doing business under the name Larry Depugh Realty.  Pending before the court are cross-motions for summary judgment filed by plaintiffs and Larry Depugh.

The court finds Depugh is entitled to summary judgment on these claims.  As an initial matter, plaintiffs have not submitted evidence in support of the proposition that Depugh has failed to register Larry Depugh Realty with the Ohio Secretary of State – plaintiffs' counsel merely asserts that it is so. The only evidence of record on this issue is Depugh's denial of that allegation.  See Larry Depugh's Answer to Plaintiffs' Request for Admission No. 3.  Further, the law in Ohio is that the use of an unregistered name, "absent some allegation or showing that the use of the name is deceptive or intended to deceive, does not violate the OCSPA."  Charvat v. DFS Services LLC, 781 F.Supp.2d 588, 596 (S.D. Ohio 2011); accord Charvat v. Farmers Ins. Columbus, Inc., 178 Ohio App.3d 118, 138, 897 N.E.2d 167, 182 (Ohio Ct. App. 2008); Ferron v. Metareward, Inc., 698 F.Supp.2d 992, 1002 (S.D. Ohio 2010) ("[R]egardless of whether the failure to register indeed presents [an OCSPA] violation that the Ohio Attorney General can pursue, there is simply no private cause of action for such lack of registration.").

In what amounts to a new claim, plaintiffs contend for the first time at the summary judgment stage that Depugh violated OCSPA because he hired Bevins as an independent contractor.  Plaintiffs' delay in asserting the claim is particularly troublesome because Depugh is defending himself *pro se* and the complaint did not give him fair notice of this claim.  Moreover, it is not entirely clear what plaintiffs' legal theory is – plaintiffs' counsel seems to argue that the independent contractor arrangement was deceptive to clients of Larry Depugh Realty because Depugh was trying to insulate himself from vicariously liability for the actions of Bevins.  See Doc. 83 at 3-4.  Plaintiffs cite absolutely no relevant legal authority in support of this theory and, in any event, have not demonstrated standing to assert the

claim. Plaintiffs expressly argue that the harm from the allegedly deceptive arrangement was to the "customers" and "clients" of Larry Depugh Realty. Id. It was Biggs, not the Milners, whom Larry Depugh Realty represented in the sale. Plaintiffs thus have made no showing that they were "consumers" of services provided by Larry Depugh Realty within the meaning of the OCSPA. O.R.C. § 1345.01(D) ("'Consumer' means a person who engages in a consumer transaction with a supplier.").

Accordingly, the court finds that defendant Larry Depugh is entitled to summary judgment on the claims for injunctive relief and OCSPA violations.

### B.     Fraudulent Concealment, Negligent Misrepresentation, and Negligence Claims

The complaint asserts that Depugh and Bevins knew of the house's mold and structural defects, as well as of Biggs's alleged attempts to conceal those problems. The complaint further alleges that defendants made misrepresentations to the Milners about the mold and structural defects and that defendants had a duty to disclose their knowledge of the defects to potential buyers. According to the complaint, defendants also breached their professional duty of care by not disclosing the defects.

Under Ohio law, a "licensee" (defined as a real estate broker or salesperson, O.R.C. § 4735.51(J)) must not knowingly provide false information to any party in a real estate transaction. O.R.C. § 4735.61. A licensee also has a duty to "disclose to any purchaser all material facts of which the licensee has actual knowledge pertaining to the physical condition of the property that the purchaser would not discover by a reasonably diligent inspection, including material defects in the property, environmental contamination, and information that any statute or rule requires be disclosed." O.R.C. § 4735.67(A). A licensee "is not required to discover latent defects in the property or to advise on matters outside of the scope of the knowledge required for real estate licensure, or to verify the accuracy or completeness of statements made by the seller, unless the licensee is aware of information that should reasonably cause the licensee to question the accuracy or completeness of such statements." O.R.C. § 4735.67(B).

In their depositions, the Milners freely admitted that Depugh and Bevins never had any contact with them or made any representations to them in connection with the sale of the house. J. Milner Dep. at 84-86; N. Milner Dep. at 215, 233. And they freely admitted that they had no basis to assert that defendants had knowledge of the defects and failed to disclose them to plaintiffs. N. Milner Dep. at

249-50, 263-67.

In response to the motion for summary judgment, plaintiffs offer no argument or evidence in support of their fraud and negligence claims, at least as those claims were presented in the complaint. Instead, plaintiffs again resort to asserting a new claim – this time alleging that defendants had knowledge of termite damage to the house and failed to disclose it to the Milners. This attempt to assert a new claim is not well-taken. Not only is there no competent evidence of record to support the assertion that defendants knew of termite damage (the attached termite inspection report that defendants allegedly reviewed in fact found no visible signs of termites), the court has denied plaintiffs' untimely attempt to amend their complaint to add termite-related claims.

### C. Conspiracy Claim

The complaint alleges that Depugh and Bevins conspired with Biggs to sell a house with structural defects. As noted above, plaintiffs have failed to produce evidence from which a jury could find that defendants had an agreement or understanding with Biggs to defraud the Milners.

### D. Unjust Enrichment Claim

The complaint alleges that Depugh and Bevins were unjustly enriched by receiving fees from the real estate transaction. This claim too has no merit, as plaintiffs have made no attempt to prove that the fees defendants earned from the transaction were paid by the Milners rather than by Biggs. See Hambelton v. R.G. Barry Corp., 12 Ohio St.3d 179, 183, 465 N.E.2d 1298, 1302 (Ohio 1984) (to prevail on a claim of unjust enrichment, a plaintiff must prove "a benefit conferred by a plaintiff upon a defendant"). Moreover, plaintiffs have made no showing as to why defendants' retention of their commission from the sales proceeds was unfair. Id.

### E. Summary

Accordingly, the motions for summary judgment filed by Larry Depugh and Patti Bevins are granted in full. Plaintiffs' motion for summary judgment as to the OCSPA claim against Depugh is denied.

**V.      Claims Against the Buyers' Real Estate Agents**

The complaint asserts claims against Angela Shanks and Brenda DePugh for injunctive relief, OCSPA violations, negligence, negligent misrepresentation, breach of fiduciary duty, conspiracy, and RESPA violations.

**A.      Motion for Partial Judgment on the Pleadings**

Shanks and DePugh have moved for judgment on the pleadings on the OCSPA and conspiracy claims.  A motion for judgment on the pleadings brought under Federal Rule of Civil Procedure 12(c) attacks the sufficiency of the pleadings and is evaluated under the same standard as a motion to dismiss. See E.E.O.C. v. J.H. Routh Packing Co., 246 F.3d 850, 851 (6th Cir. 2001); Grindstaff v. Green, 133 F.3d 416, 421 (6th Cir. 1998).  In ruling upon such motion, the court must accept as true all well-pleaded material allegations of the pleadings of the opposing party, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment.  See Grindstaff, 133 F.3d at 421.  Even so, the court will not accept conclusions of law or unwarranted inferences cast in the form of factual allegations, and it will consider as true only those factual allegations which meet a threshold test for plausibility.  See id.; Tucker v. Middleburg–Legacy Place, 539 F.3d 545 (6th Cir.2008) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)).

**1.      OCSPA Claims**

The complaint alleges numerous OCSPA violations by Shanks and DePugh.  It alleges that they committed unfair and deceptive acts by:

- steering the Milners to use Arrow to perform closing services;

- representing that Roberts was a "certified" home inspector and would provide competent services;

- failing to discuss with the Milners the as-is clause of the purchase contract;

- failing to recommend that the Milners seek legal counsel in connection with the real estate transaction;

- failing to provide the Milners with signed copies of all the documents executed in connection with their purchase of the house;

- taking advantage of the Milners' "inability to understand the numerous documents

involved in a real estate transaction";

- breaching their fiduciary duties as real estate brokers under Ohio law, O.R.C. § 4735.62; and

- doing business without having registered the name Realtec Real Estate with the Ohio Secretary of State.

Compl., ¶¶ 54-69.

Putting aside for the moment the alleged failure to register Realtec, the rest of these alleged violations all relate directly to the real estate transaction between the Milners and Biggs. These claims fail because OCSPA has no application to a pure real estate transaction. Brown v. Liberty Clubs, Inc., 45 Ohio St.3d 191, 193, 543 N.E.2d 783, 785 (Ohio 1989); see also Rose v. Zaring Homes, Inc., 122 Ohio App.3d 739, 746, 702 N.E.2d 952, 957 (Ohio Ct. App. 1997). The Brown Court made an exception for "mixed" transactions, where there exists a separate component of the transaction relating to personal property or services. See Brown, 45 Ohio St.3d at 194-95, 543 N.E.2d at 786 (where seller of real estate solicited buyers with promises of a gift or prize). But no such exception is alleged here.

Plaintiffs contend that OCSPA does apply because Shanks and DePugh performed collateral services in connection with the sale of the house. Plaintiffs argue that only the actual transfer of real property is exempted from OCSPA. According to plaintiffs, services "provided to assist in the transfer or real property" are covered by the statute. Plaintiffs again cite no legal authority for this position and they are directly contradicted by controlling precedent holding that OCSPA "is not applicable to those collateral services" performed in support of a real estate transaction. Hurst v. Enterprise Title Agency, Inc., 157 Ohio App.3d 133, 144, 809 N.E.2d 689, 697 (Ohio Ct. App. 2004) ("A collateral service solely associated with the sale of real estate is a pure real estate transaction."); see also Hanlin v. Ohio Builders and Remodelers, Inc., 212 F.Supp.2d 752, 757 (S.D. Ohio 2002) (holding that closing services are "part and parcel of the real estate transaction" and are thus outside the scope of OCSPA).

The complaint alleges that Shanks and DePugh were hired "to provide real estate services to help Buyers with the purchase of their home." Compl., ¶ 17. The complaint fails to allege that defendants supplied any services to the Milners other than the ones performed in completing the real estate transaction – reviewing the purchase contract and closing documents, and arranging for the

17

provision of home inspection and closing services that the purchase contract (which is attached to the complaint) expressly required be performed. In other words, the alleged actionable conduct is part and parcel of the sale of the house and is thus outside the scope of OCSPA.

As for defendants' alleged failure to register Realtec with the Secretary of State, again the use of an unregistered name, "absent some allegation or showing that the use of the name is deceptive or intended to deceive, does not violate the OCSPA." Charvat, 781 F.Supp.2d at 596.

Accordingly, the court grants the motion for judgment on the pleadings at to the OCSPA claims. The complaint's request for an injunction prohibiting Shanks from doing business in Ohio using the name Realtec is denied.

### 2. Conspiracy

The motion for judgment on the pleadings is also granted as to the conspiracy claim. The complaint alleges that Shanks and DePugh conspired with both Arrow to steer clients to use Arrow for title services and with Roberts to steer clients to use his home inspection services. In granting Arrow's motion for partial judgment on the pleadings as to the conspiracy claim, the court has already held that the allegations of a conspiracy among Shanks, DePugh, and Arrow are "bereft of any factual allegations in support." June 8, 2001 Opinion and Order at 5. Thus, the motion of Shanks and DePugh for judgment on the pleadings as to the conspiracy claim is granted as the claim relates to an alleged conspiracy with Arrow.

The claim as it relates to an alleged conspiracy with Roberts likewise fails. The complaint merely alleges that the defendants "conspired," without any factual allegations in support. As such, the complaint fails to properly allege the existence of an agreement among the defendants to steer clients to use Roberts for home inspections.

Accordingly, the court grants the motion for judgment on the pleadings at to the conspiracy claims.

### B. Cross-Motions for Summary Judgment

### 1. Negligent Misrepresentation

The complaint alleges that Shanks and DePugh negligently misrepresented that Roberts was

certified to perform home inspections and misrepresented the quality of his services. The complaint further alleges that the Milners relied upon the representations in deciding to hire Roberts.

A claim for negligent misrepresentation is defined as follows:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Delman v. Cleveland Hts., 41 Ohio St.3d 1, 4, 534 N.E.2d 835, 838 (Ohio 1989) (quoting Restatement (Second) of Torts § 552(1)); see also Robson v. Quentin E. Cadd Agency, 179 Ohio App.3d 298, 304, 901 N.E.2d 835, 840 (Ohio Ct. App. 2008).

Mrs. Milner testified that DePugh recommended Roberts when she asked DePugh if she knew of a good home inspector. N. Milner Dep. at 37. DePugh said that he was certified and the "best." Id. at 37-39. Mrs. Milner did not ask DePugh what she meant by "certified." Id. at 39. To Mrs. Milner, it indicated that a person has education and "knows what they're doing." Id. at 40.

Defendants are entitled to summary judgment because there is no evidence from which a jury could find that the information DePugh supplied to Mrs. Milner was false. Plaintiffs do not allege that the State of Ohio regulates home inspectors, such that the word "certified" is defined with reference to state law or some licensing requirement. Rather, even as Mrs. Milner understood it, the word signifies completion of some level of education or training. See Oxford English Dictionary (2d ed. 1989) ("attested by certificate; furnished with a certificate."). Roberts's uncontroverted testimony is that he completed a program in home inspection through Inspection Training Associates in Virginia and that he received a certificate of completion upon finishing the program. Roberts Dep. at 8-10.

Plaintiffs likewise cannot demonstrate that DePugh made a misrepresentation when she told Mrs. Milner that Roberts was the "best." Exaggerated descriptions and puffery are not actionable. See Davis v. Byers Volvo, __ Ohio App.3d __, 2012 WL 691757 (Ohio Ct. App. 2012). "[G]eneral claims of superiority," such as "unmatched," are not actionable misrepresentations. Id. (citing cases). Further, DePugh had no reason to believe that Roberts was not competent to provide services. When Roberts came to the Realtec office and asked if he could place his business cards on their information board,

he informed Shanks and DePugh that he had completed his home inspection training at Inspection Training Associates. Shanks Dep. at 28; B. DePugh Dep. at 30. Shanks and DePugh had never heard any complaints from clients who had hired Roberts. Shanks Dep. at 30; B. DePugh Decl. at ¶ 11.

Plaintiffs argue that DePugh failed to exercise reasonable care when saying that Roberts was certified because she did not require him to produce documentation of his training. This argument must be rejected. Plaintiffs cite no legal authority for imposing such a standard of care on real estate agents, and, in any event, DePugh spoke truthfully when she stated that Roberts was certified as a home inspector.

The court thus grants summary judgment in favor of Shanks and DePugh on the claim for negligent misrepresentation. The complaint's request for an injunction prohibiting Shanks and DePugh from recommending Roberts or referring to Roberts as a "certified" home inspector is thus denied.

## 2. Negligence and Breach of Fiduciary Duty

The claims for negligence and breach of fiduciary duty are both premised on the assertion that Shanks and DePugh owed a duty to abide by the standard of care found in O.R.C. § 4735.62. That statutory provision provides as to real estate brokers:

> In representing any client in an agency or subagency relationship, the licensee shall be a fiduciary of the client and shall use the licensee's best efforts to further the interest of the client including, but not limited to, doing all of the following:
>
> (A) Exercising reasonable skill and care in representing the client and carrying out the responsibilities of the agency relationship;
>
> (B) Performing the terms of any written agency agreement;
>
> (C) Following any lawful instructions of the client;
>
> (D) Performing all duties specified in this chapter in a manner that is loyal to the interest of the client;
>
> (E) Complying with all requirements of this chapter and other applicable statutes, rules, and regulations, including the Ohio fair housing law, division (H) of section 4112.02 of the Revised Code, and the federal fair housing law, 42 U.S.C.A. 3601, as amended;
>
> (F) Disclosing to the client any material facts of the transaction of which the licensee is aware or should be aware in the exercise of reasonable skill and care and that are not

confidential information pursuant to a current or prior agency or dual agency relationship;

(G) Advising the client to obtain expert advice related to material matters when necessary or appropriate;

(H) Accounting in a timely manner for all moneys and property received in which the client has or may have an interest;

(I) Keeping confidential all confidential information, unless the licensee is permitted to disclose the information pursuant to division (B) of section 4735.74 of the Revised Code. This requirement includes not disclosing confidential information to any licensee who is not an agent of the client.

O.R.C. § 4735.62.

The complaint alleges Shanks and DePugh breached their duties by failing to disclose that Roberts was not a certified home inspector and by failing to advise the Milners to obtain a qualified home inspector and to obtain legal counsel. These claims fail as a matter of law. Roberts was certified as a home inspector, and defendants were not on notice of any information that would have made it unreasonable for them to recommend Roberts as an inspector. Moreover, DePugh offered to provide the Milners with a list of other individuals who performed home inspections, but the Milners chose to hire Roberts before DePugh could provide them with the list. N. Milner Dep. at 37-38; B. DePugh Decl. at ¶ 10.

As for the claim that defendants breached their duty by not advising the Milners to obtain legal counsel in connection with the real estate transaction, the purchase contract signed by the Milners stated:

It is further acknowledged that all parties: 1) have read and understood all provision of this contract, 2) have received a copy of the entire contract, 3) *understand that any legal questions about this contract, accompanying disclosure forms and addenda, and their respective obligations should be directed to the parties' independent legal counsel . . . .*

Purchase Contract at § 14 (emphasis added). "[P]arties to contracts are presumed to have read and understood them and that a signatory is bound by a contract that he or she willingly signed." Preferred Capital, Inc. v. Power Engineering Group, Inc., 112 Ohio St.3d 429, 432, 860 N.E.2d 741, 745 (Ohio 2007). Mrs. Milner testified that she read the contract before signing it and that DePugh helped explain

it to her. N. Milner Dep. at 32-33; <u>see</u> <u>also</u> J. Milner Dep. at 25 (testifying that he read the contract before signing it). Plaintiffs have offered no evidence suggesting that Shanks or DePugh, contrary to the terms of the contract, separately discouraged the Milners from seeking legal counsel.

In briefing the cross-motions for summary judgment, plaintiffs have offered several new ways (not alleged in the complaint) that defendants breached their fiduciary duties. These include failing to: explain to the Milners the meaning of documents they signed at closing; provide copies of closing documents; inform Arrow how the Milners' names should appear on the deed; and have Mr. Milner sign a power of attorney before instructing Mrs. Milner to sign his name on his behalf. As defendants correctly observe, plaintiffs have failed to cite any competent evidence or legal authority in support of these new claims.

The court thus grants summary judgment in favor of Shanks and DePugh on the claims for negligence and breach of fiduciary duty.

### 3. RESPA Claim

The complaint alleges that Shanks and DePugh violated RESPA because they accepted kickbacks from referring clients to Arrow and Roberts. RESPA provides, "No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service . . . shall be referred to any person." 12 U.S.C. § 2607(a); <u>see</u> <u>also</u> <u>Egerer v. Woodland Realty, Inc.</u>, 556 F.3d 415, 420 (6th Cir. 2009). "Settlement services" include title services, inspections required by the sales contract, and services rendered by a real estate agent. 24 C.F.R. § 3500.2. A "referral" is defined as "any oral or written action directed to a person which has the effect of affirmatively influencing the selection by any person of a provider of a settlement service or business incident to or part of a settlement service when such person will pay for such settlement service or business incident thereto or pay a charge attributable in whole or in part to such settlement service or business." 24 C.F.R. § 3500.14(f)(1).

Plaintiffs have moved for summary judgment on the RESPA claim. Though they argue that Shanks and DePugh unlawfully steered clients to both Arrow and Roberts, the only evidence they have

submitted pertains to Arrow. Plaintiffs argue that Shanks admitted that she received payments drawn from Arrow's account upon the closing of the real estate transaction. This argument is without merit and misstates the record. Shanks admitted that her commission fees were held in escrow by Arrow and that payment was drawn from the escrow account. <u>See</u> Shanks's Answer to Plaintiffs' Request for Admission No. 9. The money Shanks received was paid by the Milners, not Arrow. Arrow simply held the money in trust upon closing. <u>See</u> Arrow Receipts and Disbursement Ledger at 1.

Moreover, plaintiffs have failed to prove as a matter of law that Shanks and DePugh had an agreement or understanding with Arrow. The evidence thoroughly establishes that no such agreement existed. Shanks Dep. at 69; B. DePugh Dep. at 48. The record likewise demonstrates that Shanks and DePugh had no agreement with Roberts. B. DePugh Dep. at 44; Roberts Dep. at 80. Plaintiffs candidly acknowledged in their depositions that they had no knowledge of any kickback agreements and that their RESPA claim was based on speculation. N. Milner Dep. at 83, 110 (testifying that she had no basis to believe the kickback allegation and that it was all based on "assumption"); J. Milner Dep. at 52-55 (same).

Shanks and DePugh did not move for summary judgment on the RESPA claim, even though they have demonstrated in their response to plaintiffs' motion for summary judgment that the claim is without merit. A court may in limited circumstances grant summary judgment *sua sponte*. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 326 (1986) (stating that "district courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence"). The key inquiries are whether the would-be losing party was on notice that the claim faced dismissal and had a full opportunity to present facts in support of his claim. <u>See</u> <u>Salehpour v. Univ. of Tenn.</u>, 159 F.3d 199, 204 (6th Cir. 1998). Among the factors a court may consider are: whether the would-be prevailing party filed a motion for summary judgment; what issues the parties focused on in their briefs; the factual materials that the parties submitted to the court; whether co-defendants of the would-be prevailing party filed motions for summary judgment and the scope of those motions; and whether the would-be losing party himself moved for summary

judgment on the claim to be considered *sua sponte*. See Excel Energy, Inc. v. Cannelton Sales Co., 246 Fed. App'x 953, 960 (6th Cir. 2007) (citing cases).

All of these considerations are satisfied here. Plaintiffs moved for summary judgment on the RESPA claim, as have the co-defendants. The relevant witnesses were deposed about the existence of the alleged agreements and kickbacks, and plaintiffs have submitted all of the evidence they believe supports their RESPA claim. Furthermore, the commission of the alleged RESPA violation necessarily requires both a giver and a recipient of the kickback. Because the co-defendants have proved as a matter of law that they never gave a kickback to Shanks and DePugh, it follows that judgment must be rendered in favor of Shanks and DePugh as well. See Columbia Steel Fabricators, Inc. v. Ahlstrom Recovery, 44 F.3d 800, 803 (9th Cir. 1995) (*sua sponte* grant of summary judgment on frivolous claim was appropriate where co-defendants had moved for and been granted summary judgment on the same issues controlling the frivolous claim and where plaintiff had full opportunity to argue the law and develop the facts of the case).

C.      Summary

Accordingly, the court grants the motion of Shanks and DePugh for partial judgment on the pleadings as to the OCSPA and conspiracy claims, denies plaintiffs' motion for summary judgment, and grants summary judgment to Shanks and DePugh on the remaining claims for injunctive relief, negligent misrepresentation, negligence, breach of fiduciary duty, and RESPA violations. Plaintiffs' motion to strike defendants' reply brief as untimely filed is denied, as defendants filed the brief on the first business day after the Sunday on which it was due.


VI.      Claims Against the Title Company

The complaint alleges that Arrow was negligent in preparing the deed because Mr. Milner's name appeared on it but Mrs. Milner's name did not. The complaint further alleges that Arrow negligently misrepresented to the Milners that the deed was "correct." Compl., ¶ 96.

Both claims fail as a matter of law. The claim for negligent misrepresentation fails because there is no evidence that Arrow made a representation to plaintiffs that the deed was correct. See Textron

Fin. Corp. v. Nationwide Mut. Ins. Co., 115 Ohio App.3d 137, 149, 684 N.E.2d 1261, 1269 (Ohio Ct. App. 1996) ("Negligent misrepresentation does not lie for omissions; there must be some affirmative false statement."). Both Mr. and Mrs. Milner testified in their depositions that Arrow made no such representation. J. Milner Dep. at 73-74; N. Milner Dep. at 108-109 (testifying that the Arrow's Chris Moore "didn't say 'your deed is correct'" but said, "'Looks like we've got everything signed.'").

Turning to the negligence claim, the court finds that a jury could not reasonable find that Arrow failed to exercise due care in preparing the general warranty deed. See Johnson v. Univ. Hospitals of Cleveland, 44 Ohio St.3d 49, 59, 540 N.E.2d 1370, 1379 (Ohio 1989) (to establish a negligence claim, plaintiff must establish that defendant failed to exercise due care). Mr. Milner was the sole borrower on the mortgage loan – his wife was not listed as a co-borrower. J. Milner Dep. at 57-58. Arrow prepared the deed based on information provided in the order for title insurance. See Title Order Confirmation. The order listed only Mr. Milner as the borrower and buyer. Id. The Milners received a copy of the title order confirmation but failed to notify Arrow that Mrs. Milner's name should also appear as a buyer. N. Milner Dep. at 99.

Plaintiffs moreover cannot prove that they have suffered any damages as a result of Arrow's alleged negligence. See Johnson, 44 Ohio St.3d at 59, 540 N.E.2d at 1379 (to establish a negligence claim, plaintiff must prove damages). Mr. Milner has not attempted to correct the deed. J. Milner Dep. at 71-72. He has failed to do so despite Arrow having offered to prepare a quit claim deed at no cost. See Doc. 68 at 7.

Accordingly, Arrow is entitled to summary judgment on the claims for negligent misrepresentation and negligence. Arrow is further entitled to summary judgment on the RESPA claims, for reasons stated in Part V.B.3 above.

## VII.    Claims Against the Home Inspector

The complaint asserts claims against Roberts for injunctive relief, OCSPA violations, negligent misrepresentation, conspiracy, fraud, and RESPA violations. The crux of all but the last of these claims is that Roberts misrepresented to the Milners that he was "certified" as a home inspector. The

complaint also alleges that Roberts misleadingly indicated that he had an affiliation with ASHI by including print-outs of ASHI's standards of practice and code of ethics in the inspection report he prepared for the Milners.

Mrs. Milner testified that Roberts told her that he was a certified home inspector. N. Milner Dep. at 179. She did not inquire any further about what he meant by "certified." Given the unrefuted evidence that Roberts was certified as a home inspector by Inspection Training Associates, Roberts Dep. at 8-10, plaintiffs cannot establish that Roberts engaged in a deceptive act for purposes of the OCSPA claim or made a misrepresentation for purposes of the negligent misrepresentation and fraud claims. Further, plaintiffs have submitted no evidence that Roberts conspired with Shanks and Brenda DePugh to steer clients to him under a false pretense that he was certified.

Also without merit is the claim that Roberts misleadingly indicated an affiliation with ASHI. Mrs. Milner admitted that Roberts never orally represented that he was an ASHI member. N. Milner Dep. at 183. The claim is based on the inclusion of ASHI materials in the inspection report. Plaintiffs, however, cannot establish that they relied on Roberts's purported affiliation with ASHI because they admit that, despite having received the inspection report before closing, they waited to read it until after closing on the house. N. Milner Dep. at 189 (stating that they did not read the report because "I wasn't sure what was in it"). Moreover, any alleged reliance on ASHI affiliation would be unreasonable as a matter of law because the first sentence of the ASHI materials stated, "Distribution of this material is not an indication of ASHI Membership." Roberts Inspection Report, ASHI Materials at 2.

In their briefs, plaintiffs allege for the first time that Roberts committed fraud because he misrepresented on the inspection report that he found nothing wrong in the crawlspace. Roberts reported that the foundation appeared serviceable and that the crawl space was dry. See Roberts Inspection Report at 6. Again, however, Milners cannot establish reliance on the report because they did not read it before closing. And any alleged reliance by the Milners on a presumption that the entire crawl space was free from defect would be unreasonable as a matter of law. Roberts specifically noted in the report that he was unable to fully access the crawl space because of fallen duct work, and the report cautioned that the inspection did not include areas that were inaccessible or not exposed to view.

Id. at 1, 6.  Finally, plaintiffs have submitted no evidence that Roberts knew or should have known of the alleged defects in the crawl space.[3]

Thus, Roberts is entitled to summary judgment on the claims for OCSPA violations, negligent misrepresentation, conspiracy, and fraud.  The court denies the complaint's request for injunctive relief prohibiting Roberts from representing that he is a certified home inspector and prohibiting him from distributing ASHI's standards of practice and code of ethics.  Roberts is also entitled to summary judgment on the RESPA claim, for reasons stated in Part V.B.3 above.

## VIII.   Conclusion

For the reasons set forth above, the motion of Shanks and Brenda DePugh for partial judgment on the pleadings (doc. 63) is GRANTED.  Defendants' motions for summary judgment (docs. 68, 77, 98, 110, 111, 112) are GRANTED.  Plaintiffs' motions for summary judgment (docs. 103,106, 107, 108) are DENIED.  The Clerk shall enter judgment in favor of the defendants.


                                                    s/ James L. Graham
                                                    JAMES L. GRAHAM
                                                    United States District Judge

DATE: April 6, 2012

---

[3]  Plaintiffs have offered no legal argument or facts that would create a disputed issue as to whether a reasonably diligent home inspector would have discovered the deteriorated beams.  Plaintiffs' counsel makes several unsupported factual assertions in the briefs to the effect that the deteriorated beams are presently within view to someone who enters the crawl space.  Not only does this assertion not account for the fallen duct work that blocked the view at the time Roberts inspected the crawl space, but counsel has offered no admissible evidence on this matter.