**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

Jason A. Milner, et al.,

               Plaintiffs,

    v.

Robin Biggs, et al.,

               Defendants.

Case No. 2:10-cv-904

Judge Graham

Magistrate Judge King

OPINION AND ORDER

      This matter is before the court on a motion for sanctions filed by defendants Arrow Title Agency, LLC, Arrow's President, Jonathan Holfinger, and its regional sales manager, Chris Moore (collectively "the Arrow defendants").  In a previous order, the court conditionally granted sanctions against plaintiffs' attorney under 28 U.S.C. § 1927.  Doc. 150.  In that order the Court determined that sanctions are warranted, and that plaintiffs' attorney would be personally liable for all attorney's fees, costs, and expenses incurred between January 11, 2011 and the Court's entry of judgment on April 6, 2012.  Doc. 150 at 6-7.  The Court requested itemized billing records from the movants and ordered additional briefs, giving each party the opportunity to address the issue of the amount of sanctions that are warranted.  The Court subsequently ordered plaintiffs, their attorney, and the arrow defendants to appear at a sanctions hearing.  Doc. 153.  This order supplants the Court's prior order conditionally granting sanctions and represents the Court's complete analysis.

**I.**     **Factual Background**

      Plaintiffs Jason A. Milner, Natasha M. Milner, and Lexi Milner filed their complaint on September 7, 2010, in the Court of Common Pleas, Pike County, Ohio.  Doc. 3.  The complaint

asserted twelve claims against twelve defendants, (nine named defendants and three John Does).

Doc. 3.  The case was removed to this Court on October 7, 2010.  Doc. 1.  Movants are three of

the nine named defendants: the title agency that prepared the deed to plaintiffs' home, and the

agency's president and regional sales manager.

    a. Plaintiffs' Claims

    The twelve claims in the complaint arose from plaintiffs' dissatisfaction with the

purchase of a home in Beaver, Ohio.  At some point after they moved into the house, plaintiffs

discovered an area under the floor that "appeared to be all rotted" and, in several places, a

substance that they believed to be mold.  Doc. 141 at 5.  Plaintiffs subsequently brought suit

against nearly everyone involved in the purchase of their home: their real estate agents, the seller,

the seller's real estate agents, the home inspector, and the title company and its employees–the

Arrow defendants.  Plaintiffs asserted six of their twelve claims against the Arrow defendants: In

Claim II for violation of the Ohio Consumer Sales Practices Act ("CSPA"), plaintiffs allege that

the Arrow defendants "committed unfair, deceptive, and/or unconscionable acts and practices in

connection with the consumer transaction with Plaintiffs . . ."  Doc. 3 ¶ 51.  The alleged

unconscionable acts include "failing to provide executed copies of all documents signed or

initialed by Plaintiffs," doc. 3 ¶ 57, "fail[ing] to prepare the closing documents in accordance

with the Purchase Contract," doc. 3 ¶ 59, and "knowingly tak[ing] advantage of the inability of

Plaintiffs to reasonably protect their interests because of Plaintiffs' inability to understand the

numerous documents involved in a real estate transaction."  Doc. 3 ¶ 61.  In Claim III for

negligence, plaintiffs allege that the Arrow defendants acted negligently and violated their duty

of care "when they failed to include the names of both Buyers as required by the Contract

documents." Doc. 3 ¶ 77.  In Claim IV for negligent misrepresentation, plaintiffs allege that the Arrow defendants "made negligent misrepresentations that the general warranty deed was correct," doc. 3 ¶ 96, that "[p]laintiffs justifiably relied on the representations," doc. 3 ¶ 98, and that "[a]s a direct and proximate result of the intentional misrepresentations, Plaintiffs have been damaged." Doc. 3 ¶ 99.  In Claim VI for civil conspiracy, plaintiffs allege that Arrow and several other defendants "are working together and steering customers to Defendants' benefit." Doc. 3 ¶ 112.  In Claim XI for violation of the Real Estate Settlement Procedures Act ("RESPA"), plaintiffs allege that their real estate agents accepted "fees, kickbacks, or things of value pursuant to an agreement or understanding, oral or otherwise, with Defendant Arrow," doc. 3 ¶ 161, and that the real estate agents "steer[ed] Plaintiffs to use Defendant Arrow's services," doc. 3 ¶ 162. Finally, in Claim XII for unjust enrichment, plaintiffs allege that "Defendant Arrow was unjustly enriched by receiving the fees for drafting of the general warranty deed which does not have both names of Buyers as required by the Contract." Doc. 3 ¶ 172.  Except for the conspiracy and RESPA claims based on alleged "steering," the gist of plaintiffs' claims against the Arrow defendants was that the deed they prepared conveyed title only to Mr. Milner instead of both Milners.

On February 24, 2011, the Arrow defendants moved for judgment on the pleadings with respect to each of the five state-law claims against them, but not on the federal RESPA claim. Doc. 27.  In an order dated June 8, 2011, the Court granted that motion in part.  Doc. 48.  The Court granted Arrow's motion with respect to plaintiffs' CSPA, conspiracy, and unjust enrichment claims and denied it with respect to the negligence and negligent misrepresentation claims.  Doc. 48 at 12-13.

The Court dismissed plaintiffs' claims for civil conspiracy and unjust enrichment because in those claims "Plaintiffs do nothing more than provide rote allegations against Arrow, offering no factual allegations to support these claims . . . ."  Doc. 48 at 5.  The Court dismissed plaintiffs' CSPA claim for two reasons: First, the Court held that the CSPA does not apply to a pure real estate transaction and because "there is nothing in Plaintiffs' claim against Arrow that distinguishes it from a typical purchase of existing real property . . . ."  Doc. 48 at 8.  Second, the Court held that even if the CSPA applied to plaintiffs' purchase of real property, "Plaintiffs only vaguely allege that the Arrow Defendants failed to adequately complete the closing documents," and these allegations are insufficient to state a claim that the Arrow defendants had engaged in unfair or deceptive acts or practices in violation of the CSPA.  Doc. 48 at 10.

The Court denied the Arrow defendants' motion to dismiss plaintiffs' negligence and negligent misrepresentation claims.  On the negligence claim, the Court held that plaintiffs' allegations that the Arrow defendants incorrectly prepared the deed and that the Arrow defendants owed plaintiffs a duty of care were sufficient.  Doc. 48 at 10-11.  As to damages, the Court concluded that "although Plaintiffs seek damages in excess of $25,000.00 for their claim of negligence, as to Arrow it would seem that the only damages related to this claim could be the costs associated with correcting the deed.  Plaintiffs have not alleged any other damages related to Arrow's actions."  Doc. 48 at 12.  It is now evident that plaintiffs incurred no such costs.  The Arrow defendants had provided plaintiffs with a corrected deed on January 11, 2011, and as of July 20, 2011, plaintiffs had taken no steps to execute or file the corrected deed.  Jason Milner Dep., Doc. 69-1 at 71-72.  Regarding negligent misrepresentation, the Court held that plaintiffs' allegations that the Arrow defendants misrepresented that the deed was correct and that plaintiffs

4

relied on that representation were "at least minimally sufficient," but noted that "[p]roving reliance on such an alleged misrepresentation may be a challenge if the deed was at the closing and Plaintiffs are able to read." Doc. 48 at 12. Plaintiffs sought and were denied reconsideration of the Court's order on the Arrow defendants' motion for judgment on the pleadings. Docs. 51, 58.

Following the Court's order on the Arrow defendants' motion for judgment on the pleadings, three of plaintiffs' six counts remained pending against the Arrow defendants for negligence, negligent misrepresentation, and RESPA violations. On September 27, 2011, the Arrow defendants moved for summary judgment on plaintiffs' remaining three claims. Doc. 68. In an order dated April 6, 2012, the Court granted the Arrow defendants' motion for summary judgment (as well as dispositive motions from all other defendants). Doc. 141. Plaintiffs' deposition testimony demonstrated that each remaining claim was entirely unfounded or speculative.

Regarding negligent misrepresentation, the Court held that not only had the plaintiffs failed to proffer any evidence that the Arrow defendants made a representation that the deed was correct, but that the plaintiffs affirmatively testified that the Arrow defendants had made no such representation. Doc. 141 at 25 (citing J. Milner Dep., doc. 69-1 at 73-74; N. Milner Dep., doc. 70-1 at 108-109 (testifying that [Arrow defendant] Chris Moore didn't say "your deed is correct" but said, "Looks like we've got everything signed.")). The Court similarly held that the evidence demonstrated that plaintiffs' negligence claim was unfounded. Arrow created the deed based on the order for title insurance, and that order listed only Mr. Milner as the borrower and buyer. Doc. 141 at 25. The plaintiffs do not allege that the Arrow defendants received a copy of the

purchase contract on which they argue the deed should have been based.  See doc. 3 ¶¶ 75-77.

The Court also found that "[t]he Milners received a copy of the title order confirmation but failed

to notify Arrow that Mrs. Milner's name should also appear as a buyer."  Doc. 141 at 25 (citing

N. Milner Dep., doc. 70-1 at 99).  Thus, "a jury could not reasonabl[y] find that Arrow failed to

exercise due care in preparing the general warranty deed."  Doc. 141 at 25.

The Court similarly held that plaintiffs RESPA claim was unfounded: "[P]laintiffs have

failed to prove as a matter of law that [the buyers' real estate agents] had an agreement or

understanding with Arrow.  The evidence thoroughly establishes that no such agreement

existed."  Doc. 141 at 23.  "Plaintiffs candidly acknowledged in their depositions that they had no

knowledge of any kickback agreements and that their RESPA claim was based on speculation.

N. Milner Dep., doc. 70-1 at 83, 110 (testifying that she had no basis to believe the kickback

allegation and that it was all based on 'assumption'); J. Milner Dep., doc. 69-1 at 52-55 (same)."

Doc. 141 at 23.

Though the Arrow defendants were ultimately granted summary judgment, the plaintiffs

themselves submitted a motion for summary judgment against the Arrow defendants on

November 28, 2011.  Doc. 108.  In that motion, plaintiffs sought "damages in the total amount of

the costs associated with correcting the deed."  Doc. 108 at 5.  As noted above, the Arrow

defendants had provided the plaintiffs with a joint survivorship deed, see doc. 146-2, yet Jason

Milner testified that plaintiffs had taken no action to file that corrected deed or otherwise

incurred any costs to correct the deed.  Jason Milner Dep., Doc. 69-1 at 71-72.

Plaintiffs appealed the dismissal of and grant of summary judgment against each of their

claims.  See doc. 143.  The Sixth Circuit Court of Appeals affirmed this Court's judgment.  Doc.

6

156.  Regarding plaintiffs' claims against the Arrow defendants, the appeals court held that "the services at issue are associated with a pure real-estate transaction and are therefore not covered by OCSPA . . . ."  Doc. 156 at 8.  The panel also affirmed this Court's grant of summary judgment in favor of the Arrow defendants on plaintiffs' negligence and negligent misrepresentation claims.  Doc. 156 at 19-20.

> ### b. Other Motions Practice

In a preliminary pretrial order dated December 8, 2010, the Court ordered discovery to be completed by September 1, 2011, and dispositive motions to be filed by October 3, 2011.  Doc. 18.  The parties commenced discovery and completed a number of depositions, including depositions of plaintiffs Jason and Natasha Milner.

On June 1, 2011, plaintiffs filed their first motion for leave to amend the complaint.  Doc. 42.  In that same motion, plaintiffs sought an extension of time to file their proposed amended complaint, and indicated that through discovery they had learned of additional parties and claims.  Plaintiffs sought to delay submitting their proposed amended complaint until after the Court ruled on the Arrow defendants' motion for judgment on the pleadings, because "[s]ome of the additional claims are dependent upon [the outcome of that motion] regarding the applicability of the CSPA to nonessential real estate and home inspection services."  Doc. 42 at 1.  Nearly a month after resolving the Arrow defendants' motion for judgment on the pleadings, the plaintiffs had not tendered a proposed amended complaint or identified the new parties or claims they wished to add.  The Court denied the plaintiffs' motion to amend because it was "wholly unable to evaluate the sufficiency of the proposed new claims . . . ."  Doc. 54 at 1.

On September 27, 2011, the Arrow defendants filed a motion seeking an order protecting

them from requests for admissions served on the Arrow defendants on August 31, 2011, the day before the September 1 discovery deadline.  Doc. 71 at 1.  Plaintiffs never opposed the motion and the Court granted it.  Doc. 94.

On October 12, 2011, the plaintiffs sought to dismiss the entire case without prejudice.  Doc. 73.  According to plaintiffs' motion, "[i]n late May, 2011, Plaintiffs had an inspection of their home  . . . [and] found that some of the damage to the home was the result of termites."  Doc. 73 at 2.  "The principal reason Plaintiffs seek voluntary dismissal is the late discovery of the termite damage, the need to include [the seller's termite inspector], an indispensable party to this action, and the failure to reach a settlement with [the termite inspector]."  Doc. 73 at 2.  Plaintiffs noted that the suit was filed "only a year ago," doc. 73 at 5, and argued that dismissal was necessary in order to allow the newly identified termite inspector to obtain representation, and for plaintiffs to conduct discovery of the termite inspector.  Doc. 73 at 6.  As to the Arrow defendants, plaintiffs argued that dismissal without prejudice was appropriate because it would "resolve" the issue of Arrow's "refus[al] to supplement their discovery claiming the discovery deadline has passed."  Doc. 73 at 7.  The Arrow defendants disagreed and argued that "[i]n light of the advanced stage of this litigation, dismissal without prejudice would result in plain legal prejudice to Arrow."  Doc. 75 at 2.

In an order dated November 7, 2011, the Court considered plaintiffs' motion under Federal Rule of Civil Procedure 41(a)(2).  That rule allows voluntary dismissal without prejudice by Court order "on terms that the court considers proper."  The Court held that voluntary dismissal was not proper: "The length of time the action has been pending and the considerable effort already expended by the defendants, including the filing of dispositive motions, weigh

heavily against dismissal of this action."  Doc. 85 at 3.  The Court was not convinced that

plaintiffs' desire to add a new defendant weighed in favor of voluntary dismissal: "[Plaintiffs] do

not explain why they cannot assert any claims they have against All State Termite in a separate

action . . . .  Plaintiffs have also been less than diligent in pursuing their claims against All State

Termite.  Plaintiffs waited over four months after discovering termite damage to seek voluntary

dismissal."  Doc. 85 at 4.  Ultimately, the Court concluded that "defendants will suffer plain legal

prejudice as the result of a dismissal without prejudice," and denied the motion.  Doc. 85 at 5.

Shortly after the Court denied plaintiffs' motion to dismiss without prejudice, the

plaintiffs filed a second motion, dated November 15, 2011, to amend their complaint.  Doc. 93.

Plaintiffs sought to add new defendants, the termite inspection firm mentioned in the motion to

dismiss, the individual termite inspector, and the inspection agency's owners, and the owner of

the real estate agency hired by the plaintiffs.  Doc. 93 at 1.  They also sought to add new claims

against the seller's real estate agents related to their hiring of the termite agency.  Doc. 93 at 1.

Plaintiffs argued that the termite inspectors were an indispensable party because "[t]he

percentage of damage attributable to termite damage versus water damage will determine the

vicarious liability and principal/agent liability attributable to the Defendants."  Doc. 93 at 4.

Plaintiffs discovered the termite damage in June of 2011.  Doc. 93 at 3.  They alerted the Court

and the defendants to their desire to add a new defendant in their October 12, 2011 motion to

dismiss without prejudice.  The proposed amended complaint would have alleged the same

CSPA, negligence, and negligent misrepresentation claims against the Arrow defendants as the

original complaint.  Doc. 93-2 at 7-18.  The proposed amended complaint did not include the

conspiracy, RESPA, or unjust enrichment claims that were asserted against the Arrow defendants

9

in the original complaint. See doc. 93-2.

In an order dated February 10, 2012, the Court denied plaintiffs' second motion to amend their complaint. The Court noted that the plaintiffs' second motion to amend came very late in the proceedings:

> It was not until November 15, 2012–thirteen months after the case was filed in this Court, two and one-half months after the close of discovery, after several dispositive motions had been filed and shortly before the date by which remaining dispositive motions were to have been filed–that plaintiffs filed the *Second Motion to Amend* and articulated for the first time their proposed new claims and identified proposed additional parties. Although plaintiffs arguably could not have moved to amend by the February 7, 2011 date for filing such motions, as established in the Court's scheduling order, the delay of almost six months from the time that plaintiffs obtained the information underlying their proposed new claims can only be characterized as undue.[1]

Doc. 134 at 4. The Court was unpersuaded that the termite inspector was a necessary party and concluded that "any prejudice redounding to plaintiffs is of their own making." Doc. 134 at 5-6. Ultimately, the Court held that "[t]o permit plaintiffs to assert their proposed new claims at this late stage would be to unfairly recast the essential nature of the case. . . . Moreover, the grant of plaintiffs' motion would either subject defendants to the reopening of discovery and the continuance of the current trial date or deprive them of the opportunity to meaningfully defend against the proposed new claims. The Court will not impose such a dilemma on defendants." Doc. 134 at 5-6.

c. Communication Between the Parties

---

[1] In their response to the Court's order conditionally granting sanctions, plaintiffs argue that "[t]his Court's so-called inexplicable delay was SIX DAYS, not six months." Doc. 152 at 8. The "delay of almost six months" identified by the Court is the time between when the plaintiffs learned of the termite damage in June of 2011, and when they sought to add the termite inspector as a defendant on November 15, 2011. See doc. 93 at 3. Plaintiffs apparently argue that they could not seek to add the termite inspector as a defendant until the Court denied their motion to dismiss without prejudice on November 7, 2011.

Very early in this litigation, on October 25, 2010, the Arrow defendants communicated to

plaintiffs' counsel their belief that the lawsuit against them was unfounded:

> Even a cursory review of your clients' allegations against Arrow Title Agency,
> LLC, Jonathan Holfinger, and Chris Moore reveals a lack of any plausible factual
> basis for any viable cause of action.  In accordance with Federal Rule of Civil
> Procedure 11©, should you and your clients not dismiss your claims against
> Arrow Title Agency, LLC, Jonathan Holfinger, and Chris Moore on or before
> November 15, 2010, and should my clients be forced to incur significant legal
> expenses in defense of these frivolous claims, my clients will seek not only
> reimbursement of any and all costs and fees associated with this defense, but also
> any and all additional sanctions warranted under the circumstances.  In this regard,
> it is respectfully demanded that this correspondence be shared with your clients.

Doc. 146-1 at 2.  The Arrow defendants subsequently sought to remedy plaintiffs' claim that they

had negligently prepared the deed to plaintiffs' home.  In a letter to plaintiffs' attorney dated

January 11, 2011, before they had moved for judgment on the pleadings, the Arrow defendants

urged the plaintiffs to file a corrected deed:

> Your complaint asserts that Arrow Title Agency, Inc. And Chris Moore
> negligently prepared the general warranty deed in connection with the sale of 3772
> Germany Road, Beaver, Ohio (the "Property").  Of course, we dispute these
> allegations.  However, there is no question that any issues relating to the parties in
> the title to the Property can be readily and inexpensively changed via recordation
> of a new deed.
>
> As of this date, your clients have not taken any measures to correct their
> alleged deficiencies with the deed, notwithstanding their obligation to mitigate
> their damages.  In that regard, we have prepared the attached:
>
> 1.     <u>Draft</u> survivorship deed conveying the Property from Jason A.
>        Milner to Jason A. Milner and Natasha M. Milner.[2]
>
> We therefore demand that you review, prepare and file either the attached
> deed or such other deed as may be acceptable to you and/or the title company with

---

[2]Notably, the purchase contract that plaintiffs argue the Arrow defendants should have used to prepare the
deed to their home is in the names of "Jason A. and Notasha M. Milner."  Doc. 108-1 at 1.  It appears that in every
other instance in the record, Mrs. Milner's first name is spelled "Natasha."

which you are affiliated.  In connection with this effort to mitigate your clients'
damages, we anticipate that you will review both the substance of the deed to be
filed and all implications in respect to the filing of it with your clients.

Please provide us with a time-stamped copy of the deed once it is
recorded.

Doc. 146-2 at 1-2.  As of July 20, 2011, more than seven months later, plaintiffs had taken no

steps to execute and file the survivorship deed.  Jason Milner Dep., Doc. 69-1 at 71-72.

On June 13, after the court granted in part the Arrow defendants' motion for judgment on

the pleadings, they again requested that the plaintiffs dismiss the claims against them:

In light of the Court's ruling on our clients' Motion for Judgment on the
Pleadings, Arrow title Agency, LLC, Jonathan Holfinger and Chris Moore hereby
request that you dismiss all remaining claims.  We propose a dismissal in
exchange for a mutual release that will provide that our clients will not pursue
reimbursement of fees and costs associated with the defense of this claim from the
date it commenced, nor will they pursue any sanctions against you or your clients.
. . .
In light of the Court's ruling, you and your clients have significant risk in
this regard, and we believe that now is the time to resolve the disputes between
our respective clients fully and amicably.  In an attempt to expedite the proposed
resolution of these matters, we attach [a settlement agreement and mutual release
and a joint motion for dismissal.]
If we are unable to settle this matter as described above, be advised that
our clients reserve all rights to pursue the actions delineated in our October 25,
2010 letter.  Kindly advise as to how you wish to proceed at your soonest
convenience.

Doc. 146-3 at 1-2.

After the Court had entered judgment against the plaintiffs on all counts, the Arrow

defendants again contacted the plaintiffs, seeking to avoid the expense of defending an appeal:

My clients are prepared to reach a resolution with your clients, the
Milners, only whereby the Milners waive any and all appellate rights and remedies
they may have associated with the captioned matter in exchange for my clients not
seeking sanctions against them, individually, pursuant to R.C. 2323.51, as
addressed in my correspondence to you of October 25, 2010.  As you can
appreciate, such a resolution would extinguish any and all exposure the Milners

12

face relative to the captioned matter.  Should such a resolution be acceptable to your clients, I will prepare a proposed settlement release in this regard and forward it to you for review and execution.  The foregoing offer of resolution as it relates to any dispute between our respective clients expires on Friday, April 20, 2012.

My clients, however, are not prepared as a component of the foregoing settlement proposal to waive, release or discharge in any way any available remedy pursuant to Rule 11 and/or R.C. 2323.51 which my clients may have against you or your law firm.  As set forth in my correspondence to you of October 25, 2010, this entire litigation has been specious, frivolous, and a blatant violation of the Ohio Rules of Professional Conduct, Rule 11, and R.C. 2323.51.  Regrettably, my clients have incurred in excess of $75,000.00 in legal fees and expenses associated with the captioned matter.  Those expenses will need to be addressed by you and/or your firm, as it is my humble belief that the misconduct of your office, not of your clients, is the root cause of this ill-conceived litigation.  In this regard, I am open to consideration of settlement proposals should you and/or your firm wish to set forth the same prior to our filing of necessary motions papers.

I recognize that the foregoing places you and your firm in an irreconcilable conflict of interest, and as such, I respectfully demand that you share a copy of this correspondence with your clients and advise them, consistent with the Ohio Rules of Professional Conduct, of their right to consult with other counsel concerning this matter and those issues addressed herein.

Doc. 146-4 at 1-2.  On April 24, 2012, the Arrow defendants' attorney e-mailed Mr. Shugart "Do your Clients have a response to my proposal dated April 11, 2012?"  Doc. 146-5.  That same day, Mr. Shugart responded, "Mr. Winter.  My clients reject your offer.  The decision is a joke.  We are appealing.  Jason."  Doc. 146-5.

Plaintiffs filed their notice of appeal on May 3, 2012.  Doc. 143.  On June 21, the Arrow defendants again contacted Mr. Shugart, notifying him of their intent to seek sanctions:

Mr. Shugart:

Please Accept this correspondence to reiterate our position on the nature of your claims against Arrow Title Agency, LLC, Jonathan Holfinger, and Chris Moore in the captioned matter.  As detailed in my October 25, 2010 and April 11, 2011 correspondence, the claims against my clients are specious at best.  It is

13

obvious that you have no good faith basis for pursuing said claims, especially in light of the irrefutable facts and applicable law.  You have now filed an equally frivolous appeal from judgments entered against your clients, again requiring my clients to expend time and resources unnecessarily.

In an attempt to resolve this matter without incurring additional fees or costs, we request that you dismiss your appeal immediately.  If not, regrettably, we will be forced to consider sanctions against you, your firm, and potentially your clients, for expenses associated with defending against the frivolous appeal. . . .

It has become painfully clear that your lawsuit against my clients–and the subsequent appeal–is wholly without merit and lacks any reasonable expectation of success.  Unless you withdraw your appeal against Arrow Title Agency, LLC, Jonathan Holfinger, and Chris Moore on or before July 9, 2012, you leave us little recourse but to seek sanctions as herein discussed including reimbursement of any and all costs and fees associated with the appeal.  As in the past, it is respectfully demanded that this correspondence be shared with your clients.

Doc. 146-6 at 1-2.

d. Motion for Sanctions

On July 19, 2012, the Arrow defendants filed a motion for sanctions "pursuant to 28 U.S.C. § 1927 and this Court's inherent authority, for recovery of attorney's fees, costs, and expenses associated with Plaintiffs' filing and maintaining this frivolous and vexatious lawsuit against Arrow."  Doc. 146 at 1.  The Arrow defendants argue that plaintiffs' attorney, Jason Shugart, engaged in five types of sanctionable behavior: 1) he continued to pursue frivolous claims against the Arrow defendants after they had provided a corrected deed, which would have remedied the only plausible wrongdoing alleged by plaintiffs, doc. 146 at 4-6; 2) he engaged in sanctionable discovery tactics, particularly propounding requests for admissions on the eve of the close of discovery, doc. 146 at 6; 3) he filed a motion to dismiss the entire case without prejudice more than a year after the action was commenced, doc. 146 at 6; 4) he filed a frivolous summary judgment motion that sought only the costs of correcting the deed, costs that the plaintiffs had not

14

incurred, doc. 146 at 6-7; and 5) he engaged in other inappropriate motions practice including meritless motions for reconsideration and motions to amend, doc. 146 at 13-14.  In their response to the Arrow defendants' motion, plaintiffs do not directly address any of these five specific claims.  Instead, they argue generally that sanctions are not warranted and that their claims were not frivolous.  See doc. 147.

In an order dated October 2, 2012, the Court conditionally granted the Arrow defendants' motion for sanctions and ordered additional briefs regarding whether sanctions are warranted and if so, the amount of sanctions that are warranted.  The Court directed the Arrow defendants to provide an accounting of all attorney's fees, costs, and expenses incurred between January 11, 2011 and April 6, 2012, together with a supporting affidavit and itemized billing records.  Doc. 150 at 8.   The Arrow defendants provided documentation of incurred expenses of $51,668.29.[3] Doc. 151.

The parties were also invited to address Mr. Shugart's "ability to pay the sanction, whether the attorney or the client was the cause of the multiplication of proceedings, [and] whether the multiplication was negligent, inadvertent, malicious, reckless, or intentional." Stephens v. Freeman-McCown, No. 99-3048, 1999 WL 993870, at *4 (6th Cir. Oct 19, 1999) (citing Reynolds v. Humko Prods., 756 F.2d 469, 473 (6th Cir. 1985)).  The Arrow defendants addressed each of the factors suggested by the court and argued 1) that "it appears that Mr. Shugart is able to pay sanctions in a reasonable amount . . . ." Doc. 151 at 3; 2) that "it is clear that Mr. Shugart is responsible for submitting the various pleadings and motions that

---

[3]  The Court's independent examination of movants' billing records finds that the fees incurred during the relevant period total $51,686.29, $18.00 more than the amount requested by movants.

15

unnecessarily multiplied these proceedings. . . . Mr. Shugart was fully apprised of the situation and proceeded regardless of the baseless nature of the claims," doc. 151 at 4; and 3) that "[b]ased on the facts and circumstances, including the numerous warnings provided to Mr. Shugart throughout the course of this case, it is all too clear that Mr. Shugart purposely and intentionally engaged in practices that unreasonably multiplied the proceedings before this court." Doc. 151 at 5.

  Mr. Shugart declined to address any of the three factors suggested by the Court. Plaintiffs spend the bulk of their responsive brief re-arguing the merits of their CSPA claim which was dismissed early in this litigation. They argue that "this Court entirely failed to understand what the CSPA is and how the CSPA is interpreted. . . . [T]his Court ignored all precedent that supported Plaintiffs' position . . . ." Doc. 152 at 3. Mr. Shugart additionally argues that the Court's order conditionally granting sanctions "contains multiple factual and procedural errors to the benefit of the Defendants . . . . This Court went so far as to reinvent the timeline of Plaintiffs' motion practice in order to justify sanctions against Plaintiffs." Doc. 152 at 5. Mr. Shugart argues that in considering sanctions, the Court has misconstrued the facts of the case. For example, plaintiffs argue that "[t]his Court's so-called inexplicable delay was SIX DAYS, not six months." Doc. 152 at 8. The "delay of almost six months" identified by the Court is the time between when the plaintiffs learned of the termite damage in June of 2011, and when they sought to add the termite inspector as a defendant on November 15, 2011. See doc. 93 at 3. Plaintiffs apparently argue that they could not seek to add the termite inspector as a defendant until the Court denied their motion to dismiss without prejudice on November 7, 2011.

  Plaintiffs also repeatedly argue that their disagreement with the Court's legal conclusions

demonstrates bias against them.  For example, plaintiffs argue that "[a]nyone with the most
rudimentary understanding of the Ohio Savings Statute understands the ENTIRE PURPOSE of
the Ohio Savings Statute is to provide a do-over.  The Savings Statute provides the citizens of
Ohio with a legal do-over, yet this Court is so repugnantly biased, the Court labels Plaintiffs
frivolous for attempting this completely legitimate legal strategy."  Doc. 152 at 11; see also doc.
152 at 12-13 ("To summarize, the Entry for sanctions is replete with erroneous information and
interpretations and sanctions are not warranted in this matter, unless the sanctions could be
assessed against this Court.").

 e. Sanctions Hearing

 In order to fully understand the actions of plaintiffs and their counsel before finally ruling
on the motion for sanctions, this Court held a sanctions hearing on Wednesday, March 6, 2013.
Counsel for the Arrow defendants and for plaintiffs had the opportunity to present evidence and
call witnesses subject to cross examination in support of their arguments on the motion for
sanctions.  The hearing provided valuable insight into the plaintiffs' and Mr. Shugart's actions,
and, as discussed below, provided further support that this is the rare case in which sanctions are
warranted.

**II. Legal Standard**

 Pursuant to 28 U.S.C. § 1927:

> Any attorney or other person admitted to conduct cases in any court of the Untied
> States or any Territory thereof who so multiplies the proceedings in any case
> unreasonably and vexatiously may be required by the court to satisfy personally
> the excess costs, expenses, and attorneys' fees reasonably incurred because of
> such conduct.

Sanctions issued under Section 1927 and under the Court's inherent authority "empower the

court to command obedience to the judiciary and to deter and punish those who abuse the judicial

process." Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater, 465 F.3d 642, 645 (6th

Cir. 2006).  The purpose of such sanctions is to "deter dilatory litigation practices and to punish

aggressive tactics that far exceed zealous advocacy." Id. at 646.  Accord Garner v. Cuyahoga

County Juvenile Court, 554 F.3d 624, 644 (6th Cir. 2009).  An attorney subject to sanctions

under 28 U.S.C. § 1927 is "required to personally satisfy the excess costs attributable to his

misconduct." Red Carpet, 465 F.3d at 646.  "Courts may consider several factors in ultimately

deciding whether to impose sanctions under § 1927.  These include an attorney's ability to pay

the sanctions, whether the attorney or the client was the cause of the multiplication of

proceedings, whether the multiplication was negligent, inadvertent, malicious, reckless, or

intentional." Stephens v. Freeman-McCown, No. 99-3048, 1999 WL 993870, at *4 (6th Cir. Oct.

19, 1999) (citing Reynolds v. Humko Prods., 756 F.2d 469, 473 (6th Cir. 1985)).  "'[W]hen an

attorney knows or reasonably should know that a claim pursued is frivolous, or that his or her

litigation tactics will needlessly obstruct the litigation of nonfrivolous claims, a trial court does

not err by assessing fees attributable to such actions against the attorney.' In re Ruben, 825 F.2d

[977,] 984 [(6th Cir. 1987).]' . . . Bad faith is not required to support a sanction under § 1927."

Wilson-Simmons v. Lake County Sheriff's Dept., 207 F.3d 818, 824 (6th Cir. 2000) (citing Jones

v. Continental Corp., 789 F.2d 1225, 1230 (6th Cir. 1986)).

 In addition to its authority under 28 U.S.C. § 1927, this Court "has the 'inherent authority

to award fees when a party litigates in bad faith, vexatiously, wantonly, or for oppressive

reasons.'" First Bank of Marietta v. Hartford Underwriters Ins. Co., 307 F.3d 501, 512 (6th Cir.

2002) (quoting Big Yank Corp. v. Liberty Mut. Fire Ins. Co., 125 F.3d 308, 313 (6th Cir. 1997)).

## III.    Analysis

In the order conditionally granting sanctions, the Court provided a number of reasons that sanctions were warranted.  Doc. 150 at 4-8.  After further briefing by the parties and a sanctions hearing, that analysis is revisited.  The analysis presented here represents the Court's complete review of the entire record before it.

The Arrow defendants argue that plaintiffs' attorney, Jason Shugart, should be subject to sanctions for three types of conduct: 1) pursuing meritless claims; 2) filing vexatious motions that multiplied the proceedings; and 3) submitting an unreasonable discovery request.

### a. Meritless Claims

The Court is hesitant to engage in "*post hoc* reasoning" to find, after the plaintiffs' claims have proven to be unsuccessful, that they were meritless from the start.  Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421-22 (1978).  Yet, here, there is no other reasonable conclusion.

Plaintiffs brought this lawsuit against nine defendants after they became dissatisfied with the home they purchased.  Plaintiffs were understandably upset to discover, among other things, damage from mold and water.  Though their disappointment with their home is understandable, some aspects of their attorney's advocacy are not.  Mr. Shugart appears to have followed the shotgun approach, suing everyone who had anything to do with the purchase of the house.  The complaint brought six claims against the Arrow defendants alleging wrongdoing in the preparation of the deed and in an alleged improper relationship between Arrow and other defendants.  None of these claims had any merit and the Arrow defendants promptly warned Mr. Shugart that they would seek sanctions if he persisted.

The lack of merit inherent in each of plaintiffs' claims against the Arrow defendants is

demonstrated by plaintiffs' deposition testimony and the Arrow defendants' early offer to fix the alleged error in the deed.  Two admissions in plaintiffs' testimony are particularly relevant.  First, plaintiffs have candidly admitted that their claims that the Arrow defendants were involved with other defendants in some sort of kickback scheme were based purely on speculation.  Mrs. Milner's testimony demonstrates this and attributes the allegations to Mr. Shugart:

> A.  [reading from complaint] "Based on information and belief, Defendant Shanks receives compensation for sending her customers to Defendant Arrow."
> Q.  Why do you believe that to be true?
> A.  I don't know.  You can ask m[y] attorney.
> . . .
> Q.  Okay.  I just want to be very clear here, that you have no personal knowledge of anything that causes you to believe that?
> A. No.

Doc. 70-1 at 5.

> Q.  Do you have any basis to believe that there was an agreement between Mr. Roberts and Ms. Shanks or Ms. DePugh where Mr. Roberts was giving them something of value in exchange?
> A.  No.  It's all under assumption.
> Q.  And the same for Arrow?  Do you have any basis to believe–
> A.  No, I don't.

Doc. 70-1 at 83.   Mr. Milner similarly testified that "I don't know of any kickbacks or any fees that they're given."  Doc. 69-1 at 52.  This testimony demonstrates that the allegations regarding a kickback scheme between Arrow and other defendants were unsupported by evidence or reasonable belief.  Mr. Shugart's testimony at the sanctions hearing further demonstrates that plaintiffs never had any evidence or reasonable belief that any kickback scheme existed.  Rather, they based these claims on a belief that because plaintiffs purchased a house with significant problems "there's a very little corrupt organization going on here, which is why I started with the litany of people because I didn't know who was involved, I didn't know what was going on."

Sanctions hearing transcr. at 19.  Nor did they ever turn up any evidence of an improper

relationship between the Arrow defendants and any other defendants.  Plaintiffs and their

attorney knew or should have known that they had no reasonable belief on which to base claims

of a kickback scheme.  This also undercuts the merits of the civil conspiracy, CSPA, and RESPA

claims.

Plaintiffs make a similar admission regarding the negligent misrepresentation claim.  Mrs.

Milner's deposition testimony:

> Q.  Do you know whether anyone from Arrow ever represented to you that the
> deed was correct?  Did they tell you, this deed is correct?
> A.  No.
> Q.  They did not?
> A.  No.

Doc. 70-1 at 108-09.  <u>Accord</u> doc. 69-1 at 73-74.  This testimony makes it clear that Mr. Shugart

knew or should have known that there was no representation on which the negligent

misrepresentation claim could have rested.

Compelling evidence supporting the proposition that these claims were presented

unreasonably and vexatiously can be found in the fact that very early on, the Arrow defendants

provided plaintiffs with a deed that would put their home in both Jason and Natasha Milner's

names.  The alleged error in the deed is the only harm or wrongdoing that had any reasonable

support in plaintiffs' allegations.  Yet plaintiffs declined to file the deed provided by the Arrow

defendants and ignored their offer to help them solve the problem.  As the Court noted in its

order on the Arrow defendants' motion for judgment on the pleadings: "[A]lthough Plaintiffs

seek damages in excess of $25,000.00 for their claim of negligence, as to Arrow it would seem

that the only damages related to this claim could be the costs associated with correcting the deed.

Plaintiffs have not alleged any other damages related to Arrow's actions." Doc. 48 at 12.  At the sanctions hearing, Mr. Shugart testified that he and his clients refused to file the deed because the arrow defendants "wanted me, basically, to go and fix [the Arrow defendants'] consumer practices violation." Transcr. at 30.  In response to the suggestion that fixing the deed was "a common sense solution," Mr. Shugart explained "Arrow's counsel can describe it as a common sense solution.  I think it was an idiotic solution.  I think it was going against my duties to the Court to not pursue these CSPA claims."  Transcr. at 92.

This is the most egregious example of obstructionist conduct by a lawyer that the court has observed in over twenty-five years on the bench.  It can best be described as a kind of mindless obstinacy.  Of course it would have been impossible for the Arrow defendants to add Mrs. Milner's name to the deed without Mr. Milner's signature on a new deed, so fixing a problem with the deed, if there was one, required the cooperation of Mr. Shugart and his clients.  Clearly Mr. Shugart was more interested in prolonging the litigation than resolving any problem with the title to the real estate.

The Court concludes that attorney Shugart pursued claims long after it should have become clear to him that they lacked merit, and in so doing multiplied the proceedings unreasonably and vexatiously.  He now advances arguments to the contrary focused on the legal theory on which he sought to base the CSPA claim.  He argues that "this Court entirely failed to understand what the CSPA is and how the CSPA is interpreted."  Doc. 152 at 3.  These arguments were properly presented to and rejected by the Sixth Circuit on plaintiffs' appeal.  <u>See</u> doc. 143.

<u>b. Mr. Shugart's Theory of "Per Se" Violations of the CSPA</u>

22

At the sanctions hearing, Mr. Shugart presented a theory of liability under the CSPA that was present in some of the motions he filed in this case.  Mr. Shugart's reading of the CSPA is impossible to reconcile with the plain text of the statute, and even were it not, his theory presents no reasonable path to liability against the Arrow defendants under the CSPA.  Plaintiffs' CSPA claims have long been analyzed and dismissed by this court and that dismissal has been affirmed by the Sixth Circuit.  The brief analysis of Mr. Shugart's novel take on the CSPA presented below serves only to demonstrate how his obsession with the CSPA has lead Mr. Shugart to unreasonably pursue claims against the Arrow defendants.

Mr. Shugart argues that Sections 1345.05(A)(3) and 1345.09(B) of the Ohio Revised Code create "per se" violations of the Consumer Sales Practices Act, and that by failing to provide executed copies of the closing documents, preparing the title in a way that was not in accordance with plaintiffs' wishes, and otherwise taking advantage of the plaintiffs, the Arrow defendants have engaged in such "per se" violations.[4]  See transcr. at 36-42.  Section 1345.05(A)(3) directs the Ohio Attorney General to:

> Make available for public inspection all rules and all other written statements of policy or interpretations adopted or used by the attorney general in the discharge of the attorney general's functions, together with all judgments, including supporting opinions, by courts of this state that determine the rights of the parties and concerning which appellate remedies have been exhausted, or lost by the expiration of the time for appeal, determining that specific acts or practices violate section 1345.02, 1345.03, or 1345.031 of the Revised Code . . . ."

OHIO REV. CODE § 1345.05(A)(3).  To satisfy this requirement to make rules and judgments available to the public, the Attorney General uses the Online Public Inspection File (OPIF).  See

---

[4] Mr. Shugart first presented a version of this theory in plaintiffs' addendum to their response to the Arrow defendants' motion for judgment on the pleadings.  See doc. 31 at 2.  It appears that Mr. Shugart first characterized the Arrow defendants' alleged violations of the CSPA as "per se" violations at the sanctions hearing.

www.opif.ag.state.oh.us.  The CSPA treats violations differently if they are specific acts that a

rule or judgment in the OPIF has already determined to be a CSPA violation rather than  novel

acts that a court determines are CSPA violations for the first time.  Section 1345.09 provides

slightly different relief to consumers who identify violations directly under the statute and under

prior rules or decision that are published in the OPIF.  This legislative device makes sense–a

specific type of consumer protection violation is more severely punished if a court or the attorney

general has already identified it as a violation of the CSPA.  Section 1345.09(A) allows a

consumer to recover "actual economic damages plus an amount not exceeding five thousand

dollars in noneconomic damages" where a court determines that the action was unfair, deceptive,

or unconscionable in a way that is not already identified by a judgment or rule present in OPIF.

If a rule or judgment in OPIF has already declared the action at issue to be deceptive or

unconscionable, the consumer may recover "three times the amount of the consumer's actual

economic damages or two hundred dollars, whichever is greater, plus an amount not exceeding

five thousand dollars in noneconomic damages . . . ."  OHIO REV. CODE § 1345.09(B).[5]

    Though Sections 1345.05 and .09 do distinguish between types of violations that are and

are not reflected in OPIF, this fact does not support the idea that if the Arrow defendants failed to

provide executed copies of documents at the closing or if they improperly prepared the plaintiffs'

title they would have committed a "per se" violation of the CSPA.  Mr. Shugart has provided the

Court with a single document, a "case detail" from OPIF that could conceivably create liability

---

[5]  At the sanctions hearing, Mr. Shugart claimed that under a prior version of Section 1345.09(B) that was amended in 2006, his clients would have been entitled not only to the $200 statutory damages per violation of the CSPA, but to have that $200 trebled.  Transcr. at 43.  Though the statute was twice amended in 2006, neither amendment is relevant to whether the $200 statutory damages are to be trebled.  No version of the statute supports such an interpretation.  See Lewis v. ACB Bus. Servs., 135 F.3d 389, 404 (6th Cir. 1998) ("Ohio Rev. Code § 1345.09(B) provides for treble actual damages or $200 in statutory damages . . . .").

under Section 1345.09(B).  At the sanctions hearing, he submitted this summary document,

drawn from OPIF, for the case Property Asset Mgt. v. Shaffer, 2008 WL 4193251 (Ohio Ct.

App., 3d Dist. Sept 15, 2008).  The "case detail" submitted by Mr. Shugart is not a judgment

"that determine[s] the rights of the parties" that the Attorney General is instructed to make

available to the public under Section 1345.05(A)(3).  It is a summary document that briefly and

imprecisely describes the court's judgment.  However, the "case detail" provided by Mr. Shugart

directs the Court to the Shaffer case.  In dismissing plaintiffs' CSPA claim, the Court has already

considered Shaffer at length and determined that it is plainly distinguishable from the facts of the

case at hand and that it provides no support for the idea that the Arrow defendants violated the

CSPA under Section 1345.09(A) or (B).  Doc. 48 at 9-10.  Mr. Shugart severely overstates the

reach of the CSPA in arguing that the mere presence of a somewhat-related case in OPIF

constitutes a "per se" violation of the CSPA.  Here, neither that case nor the evidence presented

support the proposition that the Arrow defendants violated the CSPA.

    c. Vexatious Filings that Multiplied the Proceedings

    The Arrow defendants identify five motions submitted by plaintiffs that they argue

vexatiously multiplied the proceedings: plaintiffs' first motion to amend their complaint, doc. 42;

plaintiffs' motion to reconsider the court's partial grant of judgment on the pleadings, doc. 51;

the motion to dismiss without prejudice, doc. 73; the plaintiffs' second motion to amend the

complaint, doc. 93; and plaintiffs' motion for summary judgment, doc. 108.

    Plaintiffs' first motion to amend did not include a proposed amendment, but instead

sought additional time to submit the amended complaint.  This rendered the motion to amend

devoid of any substance that the Court could meaningfully review.  See doc. 54 at 1.  As the

court previously noted "it is unclear whether [the] first motion to amend represents an attempt to delay and multiply the litigation, or simply a poorly executed motion that ended up being entirely content-less due to inadvertence or inexperience." Doc. 150 at 7.

Next, movants argue that plaintiffs filed an unfounded motion to reconsider its order granting in part the Arrow defendants motion for judgment on the pleadings (doc. 48). "Plaintiffs did not have any legitimate or reasonable grounds for filing the Motion to Reconsider. When viewed in conjunction with Plaintiffs' other untoward practices, it becomes apparent that Plaintiffs engaged in sanctionable conduct by filing the Motion to harass Arrow." Doc. 146 at 13. True, in denying the motion to reconsider, the Court found that plaintiffs had presented no rationale that would support a reconsideration:

> After carefully considering the arguments made in Plaintiffs' motion, this Court finds that there is no intervening change in the controlling law, and Plaintiffs' arguments to the contrary are without merit. Further, Plaintiffs do not point to any newly discovered evidence, nor do they present any case law in support of a claim that this Court committed a clear error of law. Last, Plaintiffs fail to make any legal argument that reconsideration would prevent a manifest injustice.

Doc. 58 at 2.

The Arrow defendants next argue that plaintiffs' motion to dismiss the lawsuit without prejudice was an attempt to unreasonably and vexatiously multiply the proceedings. Doc. 146 at 15-16. Plaintiffs argue that they were legally entitled to voluntary dismissal without prejudice, and that the motion was not frivolous or vexatious: "Anyone with the most rudimentary understanding of the Ohio Savings Statute understands the ENTIRE PURPOSE of the Ohio Savings Statute is to provide a do-over. The Savings Statute provides the citizens of Ohio with a legal do-over, yet this Court is so repugnantly biased, the Court labels Plaintiffs frivolous for attempting this completely legitimate legal strategy." Doc. 152 at 11.

26

Plaintiffs' argument that the Ohio Savings Statute entitles them to abandon a lawsuit at will and re-file it against an overlapping group of defendants is impossible to square with the text of the law, cases applying it, or common sense.  First, to the extent that plaintiffs sought to apply the Ohio law to dictate the procedure followed by this Court in considering a motion for voluntary dismissal under Federal Rule of Civil Procedure 41(a), their efforts are misguided.  See Hanna v. Plumer, 380 U.S. 469 (1965).  Second, and more fundamentally, the Ohio Savings Statute does not, by its terms, entitle plaintiffs to voluntary dismissal.  The statute provides that:

> (A) In any action that is commenced or attempted to be commenced, . . . if the plaintiff fails otherwise than upon the merits, the plaintiff . . . may commence a new action within one year after the date of the reversal of the judgment or the plaintiff's failure otherwise than on the merits or within the period of the original applicable statute of limitations, whichever occurs later."

Ohio Rev. Code § 2305.19.  By its terms, the savings statute allows a plaintiff whose case has failed "other than on the merits" to re-file the case within one year, even if the relevant statute of limitations has run.  The right granted by the savings statute relates to the timing of a second suit after the non-merits failure of a timely suit.  It does not, as plaintiffs argue, grant plaintiffs the right to dismiss ongoing litigation at any point on any whim.  The single report and recommendation cited by plaintiffs to support their argument does not hold to the contrary.  In Iacovone v. Wilkinson, the magistrate judge recommended dismissal of the plaintiff's first claim because, although his voluntary dismissal constituted failure "otherwise than upon the merits," he was still not entitled to re-file that claim after the limitations period because that initial failure had occurred before the statute of limitations had run.[6]  No. 2:03-CV-652, 2005 WL 3299032, at

---

[6] Notably, the district court declined to adopt the report and recommendation cited by plaintiffs.  See Iacovone v. Wilkinson, No. 2:03-CV-652, 2006 WL 689102 (S.D. Ohio Mar. 14, 2006).

*7-8 (S.D. Ohio Dec. 2, 2005).  The report says nothing to support the idea that the law entitles plaintiffs to dismiss without prejudice.  Plaintiffs have advanced no plausible argument that they had a right to voluntarily dismiss their entire case more than a year after commencing it and after discovery had been completed.  Additionally, Federal Rule of Civil Procedure 41(a) allows the Court to grant voluntary dismissal "on terms that the court considers proper."  Given the advanced stage of the litigation when plaintiffs sought to dismiss and the significant costs incurred by all parties, the Court held that dismissal was plainly not proper.  See doc. 85.  The lack of any reasonable legal argument in support of plaintiffs motion to dismiss without prejudice supports the conclusion that its goal was not to promote judicial efficiency by dismissing a year-old case after significant discovery, but to multiply the litigation.

The next motion that the Arrow defendants argue vexatiously multiplied the litigation is plaintiffs' second motion to amend the complaint.  See doc. 93.  The Court set the deadline for motions to amend for February 7, 2011.  Doc. 18 at 1.  The second motion to amend came more than nine months later.  In denying the motion, the Court concluded that the plaintiffs had not been diligent in identifying potential new parties and new claims and seeking to amend their complaint, and had not done so until after the close of discovery.  Doc. 134 at 4-6.

Plaintiffs sought to add a termite inspector as a defendant in the case after discovering termite damage in their home.  They provide two reasons that they could not have moved to amend the complaint, adding the termite inspector any sooner.  First, they did not discover the termite damage until June of 2011.  According to plaintiffs, this delay is attributable to the weather.  "In order to perform a proper inspection of a home with water problems, the inspection must be performed when the ground is saturated and rain is falling.  As there is little rainfall in

28

late summer and fall and the ground is not saturated at this time of year, there was no way to determine where the water was coming from." Doc. 93 at 3. Plaintiffs do not explain how the lack of adequate rainfall influenced their ability to discover termites. Second, once plaintiffs discovered the termite damage in June of 2011, they did not indicate their desire to add a new defendant until their October 12, 2011 motion to dismiss without prejudice because "[t]he termite inspector requested the opportunity to inspect the home and possibly settle before Plaintiffs amended their complaint." Doc. 93 at 3. This inspection was not completed until September, 2011, when "the termite company refused to settle." Doc. 93 at 3. At that point, the plaintiffs filed their motion to dismiss without prejudice. While the plaintiffs negotiated with the termite inspector, they proceeded with the case, in which discovery had closed on August 31, 2011. When they discovered termite damage in June, 2011, discovery was ongoing. Moving to amend at that point, though still extremely late, would have been far less burdensome than waiting for the termite inspector to inspect, and waiting for the failure of settlement negotiations. Waiting until discovery was over, and then seeking to add a new party, approximately five months after learning of the termite damage, can only be described as an attempt to multiply the proceedings.

Plaintiffs' desire to add additional parties and, to some extent, change the nature of the case at a late date may not alone constitute sanctionable behavior. The problem is that the plaintiffs sought to take the Arrow defendants along for that ride. There is no plausible connection between the Arrow defendants and the parties the plaintiffs sought to add, nor did the remaining claims against Arrow have merit and their lack of merit would have been obvious to any reasonable person long before the motion was filed. Refusing to dismiss the Arrow

29

defendants with prejudice and instead including them in the proposed amended complaint vexation multiplication of the proceedings.  A reasonable motion to dismiss would have dismissed the arrow defendants with prejudice and a reasonable proposed amended complaint would  not have continued to pursue meritless claims against Arrow and its employees.

Finally, the Arrow defendants argue that the plaintiffs' motion for summary judgment vexatiously multiplied the proceedings.  Doc. 108.  In that motion, plaintiffs seek "damages in the total amount of the costs associated with correcting the deed."  Doc. 108 at 5.  Plaintiffs' testimony demonstrates that they had incurred no such costs.  The Arrow defendants provided a deed with which plaintiffs could have put the home in both Mr. and Mrs. Milner's names, but they testified that they did not file it.  Given that the motion for summary judgment seeks damages that the plaintiffs candidly admitted they never suffered, the motion was plainly vexatious and multiplied the proceedings before this Court.

Alone, it is possible that any one of the vexatious motions described above would be insufficient to support sanctions.  Together, and in the context of the pursuit of meritless claims, these five motions demonstrate a disregard for fair and efficient judicial process and suggest an intent to abandon notions of fairplay.  Like the pursuit of meritless claims discussed above, the motions discussed here support the award of sanctions.

### d. Unreasonable Discovery Request

The Arrow defendants' final argument is that sanctions are warranted because plaintiffs propounded an unreasonable discovery request.  Plaintiffs submitted requests for admissions on the day before discovery closed.  The Court agrees that this request was unreasonable.  The pretrial order instructs the parties to make discovery requests "sufficiently in advance to permit

timely response by [the end of discovery date]." Doc. 18 at 2. The Arrow defendants were forced to seek an order protecting them from the request in a motion that went unopposed by the plaintiffs. Though this example of plaintiffs' litigation practice supports sanctions, it does so only incrementally, supporting the substantial and adequate reasons for awarding sanctions discussed above.

e. Mr. Shugart's Overzealous, Obsessive and Abusive Litigation Tactics

The Court acknowledges Mr. Shugart's zeal for and desire to enforce the CSPA. Unfortunately, in this case, a zeal that otherwise might be laudable, has become an obsession that has clouded Mr. Shugart's attention to his duties as an officer of the court. Further, his obsession has victims–the Arrow defendants upon whom extensive litigation expenses have been imposed in furtherance of Mr. Shugart's obsession.

Mr. Shugart's primary failure in this case, was his inability to recognize the essence of the CSPA–to protect consumers from *unconscionable, unfair, and deceptive* acts or practices. At most, the allegations presented by Mr. Shugart and his clients support the idea that the Arrow defendants made a mistake based on a title order form that the court of appeals characterized as "ambiguous." Doc. 156 at 20. The single, plainly distinguishable case identified by plaintiffs can not reasonably contradict what the course of this case makes clear–the Arrow defendants did not act in an unconscionable, unfair, or deceptive way, and the plaintiffs never had any reason to believe that they did.

Mr. Shugart's penchant for bringing CSPA claims is not limited to this action. He testified that he has represented clients in scores of CSPA cases and is often accused of sanctionable conduct. Sanctions Hearing Transcr. at 26. The case of Davis v. Byers Volvo is

consistent with the theories he expounded in the sanctions hearing.  In that case, Mr. Shugart and his clients brought claims against former football player and television personality Kirk Herbstreit.  No. 11CA817, 2012 WL 691757 (Ohio Ct. App. Feb. 24, 2012).  Plaintiffs alleged that Mr. Herbstreit's statements in auto commercials were unfair or deceptive under the CSPA. Id. at *2.  Plaintiffs took their car to the service shop advertised by Mr. Herbstreit fourteen times before the commercials aired, and seven times afterwards.  Id.  Plaintiffs claimed that though they were dissatisfied with the service they received at the auto shop because of Mr. Herbstreit's endorsement.  Id.  In dismissing the claims against Mr. Herbstreit, the court made their frivolous nature clear:

> Noticeably absent from [plaintiff's claims] is any assertion that appellee's statements, in and of themselves, misled him about the quality of the Byers service department.  Instead, [plaintiff's] averments rely upon appellee's purported celebrity status alone as an indicator of deception.  His basic claim is that only because appellee is a celebrity did he believe that he would receive superior service from Byers.  We are unaware of any case stating that celebrity status alone demonstrates deceptiveness, and appellants have cited none.  We further note that the point of the CSPA is to prohibit deceptive acts or practices.  We are unable to conceive how a celebrity speaking on behalf of a corporation, by itself, establishes deceptiveness.

Id. at *10.  In short, this case is not the first time that Mr. Shugart has filed a CSPA claim in the plain absence of any unfair or deceptive act or practice.

### f. The Expenses Incurred by Movants

In the order conditionally granting sanctions, the Court found that plaintiffs engaged in sanctionable actions between January 11, 2011 and April 6, 2012–from the time that the Arrow defendants attempted to remedy the alleged defect in the deed until this Court entered judgment. The foregoing analysis confirms that this is the period in which plaintiffs' actions most vexatiously multiplied the proceedings.

32

The Arrow defendants have presented itemized billing records demonstrating incurred expenses of $51,668.29 during the relevant time.  Plaintiffs' responsive brief does not object to the records nor otherwise argue that the sum requested by the Arrow defendants is not a fair and reasonable amount incurred.  After examining the records provided by movants and considering the hourly rates charged, (a maximum rate of $185.00/hour,) the Court concludes that the expenses requested by the Arrow defendants are reasonable.

g. Other Considerations

The purpose of 28 U.S.C. § 1927 is to "command obedience to the judiciary and to deter and punish those who abuse the judicial process."  Red Carpet Studios, 465 F.3d at 645.  The foregoing analysis has demonstrated that plaintiffs have abused the judicial process by pressing claims without merit against the Arrow defendants and repeatedly filing vexatious motions that prolonged and multiplied the proceedings and created significant expense.

In considering the amount of sanctions to order in a given case, a panel of the Sixth Circuit Court of Appeals has suggested that this Court should consider the attorney's "ability to pay the sanctions, whether the attorney or the client was the cause of the multiplication of the proceedings, [and] whether the multiplication was negligent, inadvertent, malicious, reckless, or intentional."  Stephens v. Freeman-McCown, No. 99-3048, 1999 WL 993870, at *4 (6th Cir. Oct 19, 1999) (citing Reynolds v. Humko Prods., 756 F.2d 469, 473 (6th Cir. 1985)).  The parties were invited to address these factors.  Plaintiffs' attorney declined to do so.  Mr. Shugart's testimony at the sanctions hearing, however, provided significant clarity to these issues.

First, it is clear that Mr. Shugart, rather than his clients, was the cause of the multiplication of the proceedings.  He admitted as much at the sanctions hearing when he

33

described a quasi-indemnification of his clients by which they agreed with his recommendations to pursue their claims, and he agreed that he was responsible for any sanctions.  "Any sanctions or repercussions that come from this today lie solely on my shoulders."  Transcr. at 8.  "Now, this is the first hearing on sanctions I've had to attend, but I always advise my clients that we may be in this situation.  And I tell them if we are in that situation and you're relying on my opinion about the CSPA, it's on me."  Transcr. at 28.

Part of the attorney's function is to evaluate clients' claims and counsel against bringing vexatious and meritless claims.  Mr. Shugart failed at that gatekeeping function, which is necessary to maintain an efficient judicial process and fairness to adverse parties.  Several of plaintiffs' claims were subsequently undercut by plaintiffs' own testimony.  Generally, an attorney should be sufficiently familiar with their clients' positions to recognize that their own testimony contradicts a claim they might attempt to bring.  At the very least, when such testimony surprises an attorney, the baseless claims should be dropped.

Second, it appears that much of the multiplication was intentional.  See transcr. at 59 (Mr. Shugart describes his actions as "very deliberate.").  True, some of the frivolous motions filed by Mr. Shugart can be favorably interpreted as simply inadvertent or reckless.  For example, alone, plaintiffs' first motion to amend or their motion to reconsider could be interpreted as zealous advocacy that inadvertently crosses the line into vexatious multiplication.  When viewed as a whole, however, it becomes clear that Mr. Shugart included the Arrow defendants in this case not because the plaintiffs had any reason to believe that they played a role in bringing about their unfortunate circumstance, but because they were another party from whom a settlement might be extracted by the threat of protracted litigation.  The intentional nature of Mr. Shugart's conduct is

further demonstrated by the fact that once discovery was completed, he sought to end the litigation entirely only to start it again in another suit against an overlapping group of defendants. This is vexatious multiplication and it warrants sanctions.

Finally, in response to the Court's request, Mr. Shugart declined to address his ability to pay a substantial sanction. However, at the sanctions hearing, he testified that he had the ability to satisfy the substantial sanctions under consideration. Transcr. at 65. The Court concludes that the Arrow defendants' legal expenditures during the relevant time period represent a reasonable sanction amount for Mr. Shugart's unreasonable multiplication of this litigation.

To be clear, Mr. Shugart is not sanctioned here for his failure to grasp the terms of the CSPA or his desire to reform Ohio consumer protection law. He is sanctioned for his relentless and unreasonable pursuit of a monetary extraction from the Arrow defendants in the face of facts and law making clear that plaintiffs' claims and Mr. Shugart's actions lacked merit. His obsession with his novel and unsupported theory of the CSPA blinded Mr. Shugart to the costs of pursuit of a meritless theory, a pursuit that far exceeded zealous advocacy and unreasonably and vexatiously multiplied this litigation. Mr. Shugart's obsession had costs and victims. Here, the Court seeks to provide redress for the unreasonable multiplication of this litigation inflicted by Mr. Shugart upon the Arrow defendants.

Without sanctions, the Court can not be certain that Mr. Shugart will cease to impose the costs of meritless litigation on others. The Court must provide some recourse for those upon whom Mr. Shugart has pressed CSPA claims in the clear absence of any unfair, deceptive, or unconscionable act or practice. Notably, Mr. Shugart is involved in another pending consumer action in which he is the plaintiff rather than the attorney. See Complaint, Shugart v. Ocwen

35

Loan Servicing, LLC, 2:09-cv-1123 (S.D. Ohio, Dec. 14, 2009).  Mr. Shugart has extensively

engaged in litigation under the CSPA–he testified that he has had seventy or eighty consumer

cases over the last ten years.  Transcr. at 14.  The court finds that sanctions are necessary in order

to punish his behavior in this case, and ensure that he does not engage in similar vexatious

multiplication of proceedings in the future.

**IV. Conclusion**

      For the foregoing reasons, the motion for sanctions is GRANTED.  Plaintiffs' attorney,

Jason Shugart, shall personally pay sanctions in the amount of $51,668.29 to defendants Arrow

Title Agency, Jonathan Holfinger, and Chris Moore.

      IT IS SO ORDERED.


                                        S/ James L  Graham
                                        James L. Graham
                                        UNITED STATES DISTRICT JUDGE


Date: April 5, 2013